FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE** FEB 23  PM 4:06

| | |
|---|---|
| ACCESS GROUP, INC. ) | |
| ) | 0 7 ⁻ 1 1 6 |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. __-___-___ |
| ) | |
| THE EDUCATION RESOURCES ) | |
| INSTITUTE, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | Jury Trial Demanded |

**COMPLAINT**

Plaintiff, Access Group, Inc., by its undersigned attorneys, hereby files this complaint against the defendant, The Education Resources Institute, Inc., and alleges as follows:

**PARTIES**

1. Access Group, Inc. ("Access Group") is a corporation incorporated under the laws of Delaware, having its principal place of business at 5500 Brandywine Parkway, Wilmington, Delaware.  Access Group is in the business of providing education financial aid services and student loan financing.

2. The Education Resources Institute, Inc. ("TERI") is a business incorporated under the laws of Massachusetts, and, upon information and belief, its principal place of business is at 31 Saint James Street, 6th Floor, Boston, Massachusetts.  TERI is in the business of providing education financial aid services and student loan financing.

## JURISDICTION AND VENUE

3. This Court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a) because this case arises under the laws of the United States, including the Trademark Laws of the United States, 15 U.S.C. §§1051 et. seq.

4. This Court has jurisdiction over the unfair competition claims herein under 28 U.S.C. § 1338(b) because these claims are joined with a substantial and related claim under the Trademark Laws of the United States, 15 U.S.C. §§ 1051 et. seq. Pursuant to the supplemental jurisdiction of this Court 28 U.S.C. § 1367, this Court has jurisdiction over common law and other claims not arising under the laws of the United States asserted herein, because these claims are so related to claims within the original jurisdiction of this Court that they form part of the same case or controversy.

5. This Court has personal jurisdiction over TERI pursuant to Section 12.5 of the Coordination Agreement attached as Exhibit A to this Complaint, under which TERI consented to submit to jurisdiction in any state or federal court in the State of Delaware in "any action or proceeding arising out of or relating to this Agreement." Moreover, upon information and belief, TERI regularly conducts or solicits business in Delaware.

6. Venue is proper pursuant to 28 U.S.C. § 1391(c) because this Court has personal jurisdiction over TERI pursuant to Section 12.5 of the Coordination Agreement attached as Exhibit A to this Complaint, under which TERI consented to submit to jurisdiction in any state or federal court in the State of Delaware in "any action or proceeding arising out of or relating to this Agreement."

2

### FACTUAL BACKGROUND

7. Access Group is the owner of a family of trademarks, all of which incorporate the term ACCESS, including Registration No. 2,036,077 for the mark THE ACCESS GROUP; Registration No. 2,093,437 for the mark THE ACCESS GROUP; Registration No. 1,956,097 for the mark NEED ACCESS; Registration No. 1,953,050 for the mark NEED ACCESS; Registration No. 1,956,095 for the mark LAW ACCESS; Registration No. 1,994,686 for the mark BUSINESS ACCESS; Registration No. 2,036,062 for the mark GRADUATE ACCESS; Registration No. 2,036,061 for the mark DENTAL ACCESS; and Registration No. 2,107,587 for the mark MEDICAL ACCESS; Registration No. 2,226,409 for the mark HEALTH ACCESS; and Registration No. 2,084,912 for the mark ACCESS ADVISOR. These marks are valid, subsisting and incontestable. Access Group is also the owner of record of Registration No. 2,395,180 for the mark ACCESS GROUP; Registration No. 2,395,179 for the mark ACCESS ADVISOR ADMINISTRATOR; Registration No. 2,680,791 for the mark COMPREHENSIVE ACCESS; and Registration No. 2,680,790 for the mark SPONSORED ACCESS. These marks are valid and subsisting. (Collectively, "Access Group's ACCESS marks.") Copies of each registration are attached as Exhibit B .

8. Access Group, including through its predecessor in interest, began actively promoting and selling educational financial aid services using Access Group's ACCESS marks in interstate commerce since at least as early as 1986. Use of the ACCESS marks in interstate commerce by Access Group is continuous and ongoing. The services sold and

3

promoted under Access Group's ACCESS marks include education financial aid services and student loan financing services.

9. Within the market for student financial aid services and student loan financing services, Access Group has built valuable good will in Access Group's family of ACCESS marks by providing student loan financing directly to students and their families and by providing education financial aid services directly to students and their families and to the financial aid departments within educational institutions.

10.    On or around March 23, 1995, Access Group and TERI, among other parties, entered into the "Coordination Agreement", pursuant to which, in Section 6.2, TERI agreed that it would not "use the term 'Access' as a service mark in connection with the provision of education financial aid services." A true and correct copy of the Coordination Agreement is attached as Exhibit A to this Complaint.

11.    Notwithstanding the Coordination Agreement, in 2004, the Higher Education Information Center ("HEIC"), which at that time had been in existence for twenty years, was renamed the TERI College Access Centers and School-based Programs. Upon information and belief, TERI College Access Centers and School-based Programs is affiliated with, owned and operated by TERI.

12.    At least as early as June 6, 2005 TERI began to use the COLLEGE ACCESS mark and TERI COLLEGE ACCESS mark to promote and provide education financial aid services and student loan financing services to students and families.

13.    TERI operates a website under its TERI COLLEGE ACCESS mark, www.tericollegeaccess.org, which provides information and solicits business from students and

4

families across the United States. The website provides links for "Planning & Paying for College" and "Financial Aid & Scholarships" and indicates that "TERI College Access advisors work with students and families ... to assist in planning and paying for college."

14.     The www.tericollegeaccess.org website also provides a link to the website found at www.teri.org, which directly offers student loan financing services to students and families across the United States. This website, **www.teri.org**, is interactive and invites individuals from across the United States, including but not limited to, those who access it from www.tericollegeaccess.org, to submit personal information and payment to TERI via an online loan application. The www.teri.org website also offers a toll-free number for calls.

15.     The www.teri.org website uses the terms COLLEGE ACCESS, TERI COLLEGE ACCESS as trademarks and describes TERI College Access Centers, offers multiple loan programs, provides a facility for applying for a student loan on line, identifies TERI lenders, links to a 7 page PDF document describing use of the TERI logo, and links directly to ww.tericollegeaccess.org.

16.     On or about August 17, 2005, the president of Access Group notified TERI by a letter to TERI's president that TERI was infringing the trademark rights of Access and breaching the 1995 Coordination Agreement. A copy of that letter is attached to this Complaint as Exhibit C. In that letter, Access Group stated that "we will expect that TERI will promptly cease all use of the ACCESS mark, including changing both the tericollegeaccess.org website and the domain name." Access Group further informed TERI in the letter that it "takes this matter very seriously and therefore must insist that TERI immediately take action to stop use of the ACCESS mark."     Since that time, TERI has

5

continued to infringe the trademarks of Access. The parties have held numerous conversations since Access Group's August 2005 letter and have not been able to resolve this matter amicably.

DB02:5801432.1                                                                 048032.1014

## FIRST CAUSE OF ACTION
(Breach of Contract)

17.    Access Group repleads the allegations set forth in paragraphs 1 through 16, inclusive.

18.    In the Coordination Agreement, TERI expressly agreed that it would not "use the term 'Access' as a service mark in connection with the provision of education financial aid services" without the prior written consent of Access Group.  Exhibit A , Section 6.2.

19.    TERI is currently using the term "Access" as a service mark, namely COLLEGE ACCESS and TERI COLLEGE ACCESS, in connection with the provision of education financial aid services.  Access Group has not provided prior written consent for their use of ACCESS in conjunction with education financial aid services.

20.    TERI has breached the Coordination Agreement.

21.    Access Group has performed all of its obligations under the Coordination Agreement.

22.    Access Group has been and continues to be injured by TERI's breach of the Coordination Agreement.

23.    Under the Coordination Agreement, TERI agreed to pay for "any loss, liability or expense, including reasonable attorney's fees resulting from, or attributable to, any breach" by TERI of its obligations under the Coordination Agreement.  Exhibit A , Section 12.7.

7

## SECOND CAUSE OF ACTION
(Federal Trademark Infringement)

24.   Access Group repleads the allegations set forth in paragraphs 1 through 23 , inclusive.

25.   TERI has infringed Access Group's federally-registered ACCESS marks in interstate commerce by various acts, including promoting and providing student loan financing services using the marks COLLEGE ACCESS and TERI COLLEGE ACCESS.

26.   The use of the COLLEGE ACCESS and TERI COLLEGE ACCESS marks by TERI to promote and provide student loan financing to students and families, is without permission or authority of Access Group, and continues even after TERI received Access Group's objection.

27.   The use of the COLLEGE ACCESS and TERI COLLEGE ACCESS marks by TERI to promote and provide student loan financing to students and families is likely to cause confusion and mistake and to deceive the public as to the source of TERI's services in violation of 15 U.S.C. § 1114.

28.   On information and belief, TERI's acts of trademark infringement have been committed with the intent to cause confusion and mistake, and deceive the public as to the source of TERI's services.

29.   By virtue of the Coordination Agreement and the federal trademark registrations, 11 of which are incontestable, as well as the August 17, 2005, letter from Access Group notifying TERI that its actions infringed Access Group's trademark rights and violated the 1995 Coordination Agreement, TERI had actual notice of Access Group's ACCESS trademark

8

048032.1014

registrations and use of other ACCESS marks as service marks, but TERI has continued its infringement.

30.    By reason of TERI's acts of trademark infringement, Access Group has suffered and will suffer damage to its business, reputation and good will.

31.    As a result of TERI's acts of trademark infringement, Access Group has been and continues to be damaged by TERI's conduct in an amount not yet determined, which it is entitled to recover. Additionally, Access Group is entitled to injunctive relief and to all other remedies provided by law, including, without limitation, those set forth in 15 U.S.C. §§ 1116, 1117, and 1118.

### THIRD CAUSE OF ACTION
(Federal Unfair Competition)

32.    Access Group repleads the allegations set forth in paragraphs 1 through 31, inclusive.

33.    The above-described acts of TERI constitute unfair competition and an infringement of plaintiff's common-law rights in the ACCESS marks.

34.    The above-described acts of TERI are likely to cause confusion, mistake or to deceive the purchasing public as to the source or origin of TERI's services, and to cause the purchasing public to believe, wrongly, that TERI's services are sponsored by, affiliated with or otherwise connected with Access Group, constituting unfair competition and a false designation of origin in violation of 15 U.S.C. § 1125.

35.    Upon information and belief, TERI's acts of unfair competition have been committed with the intent to cause confusion, mistake and deception among consumers.

DB02:5801432.1                                                                                              048032.1014

36.    Upon information and belief, TERI's acts of unfair competition have been committed with the intent to pass off and palm off TERI's services as the services of plaintiff, and with the intent to deceive and defraud the public.

37.    As a result of TERI's acts of unfair competition, Access Group has been, and continues to be, damaged by TERI's conduct in an amount not yet determined, which it is entitled to recover. Additionally, Access Group is entitled to injunctive relief and to all other remedies provided by law, including without limitation those set forth in 15 U.S.C. §§ 1116, 1117, and 1118.

## FOURTH CAUSE OF ACTION
### (False Designation of Origin in Violation of Lanham Act)

38.    Access Group repleads the allegations set forth in paragraphs 1 through 37, inclusive.

39.    TERI has made and is making unauthorized use of the term "ACCESS" as a service mark in connection with the provision of education financial aid services in interstate commerce. This unauthorized use is a false designation of origin that is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection or association of TERI with Access Group and as to the origin, sponsorship, or approval of such education financial aid services by Access Group.

40.    These acts are in violation of 15 U.S.C. §1125(a), in that TERI has used in connection with goods and services a false designation of origin, a false or misleading description and representation of fact that is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association of defendant with plaintiff and as

10

048032.1014

to the origin, sponsorship, and approval of defendant's goods, services and commercial activities by Access Group.

## FIFTH CAUSE OF ACTION
### (Unfair Competition and Deceptive Trade Practices in Violation of State Law)

41. Access Group repleads the allegations set forth in paragraphs 1 through 40, inclusive.

42. Access Group is the owner of the "ACCESS" marks, which are distinctive and protected by state law.

43. The above-described acts of TERI constitute a violation of state law prohibiting unfair and deceptive trade practices.

44. In the course of its business, TERI has made unauthorized use of plaintiff's marks in connection with education financial aid services in U.S. commerce.

45. Defendant's unauthorized use of the "ACCESS" marks effects a passing off of the defendant's services as those of plaintiff and causes a likelihood of confusion or misunderstanding among the public as to affiliation, connection, association with or certification by plaintiff.

46. Defendant's unauthorized use of the "ACCESS" marks create a likelihood of confusion or of misunderstanding among the public.

## PRAYER FOR RELIEF

**WHEREFORE**, Access Group prays this Court enter judgment against TERI as follows:

1. Finding that TERI has breached the Coordination Agreement;

11

2. Finding that TERI has infringed Access Group's exclusive rights in the "ACCESS" marks and engaged in unfair competition, false designation of origin and deceptive trade practices in violation of federal and state laws and the Coordination Agreement;

3. Preliminarily and permanently enjoining TERI and its officers, agents, employees and those in active concert with them from directly or indirectly using COLLEGE ACCESS, TERI COLLEGE ACCESS or any other mark, word or name potentially confusingly similar, to Access Group's ACCESS marks in the United States;

4. Preliminarily and permanently enjoining TERI and its officers, agents, employees and those in active concert with them from unfairly competing with Access Group;

5. Requiring TERI to remove from the market all materials that depict, constitute or bear any colorable imitation of Access Group's ACCESS marks and to file with the Court a report detailing the manner in which TERI has complied with this judgment;

6. Awarding damages, including prejudgment and post-judgment interest, sustained by Access Group on account of TERI's breach of contract and acts of trademark infringement, unfair competition, and unfair trade practices in the United States;

7. Awarding treble damages for TERI's willful infringement of the marks in suit;

8. Awarding Access Group's costs and disbursements incurred in connection with this action;

9. Declaring that this is an exceptional case and that plaintiff be awarded its reasonable attorneys fees, including but not limited to any such fees to which it is entitled pursuant to Section 12.7 of the Coordination Agreement; and

10. Granting such other and further relief as this Court deems just and proper.

DB02:5801432.1

048032.1014

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP

Elena C. Norman (No. 4780)
Sara Beth A. Reyburn (No. 4137)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware  19899-0391
(302) 571-6600
enorman@ycst.com
sreyburn@ycst.com
**Attorneys for Plaintiff Access Group, Inc.**

OF COUNSEL:

FOLEY & LARDNER LLP

Brian McNamara
3000 K Street NW, Suite 500
Washington, DC 20007
Phone (202) 672-5416
Fax (202) 672-5399

Richard J. McKenna
777 E. Wisconsin Ave
Milwaukee WI, 53202
Phone (414) 271-2400
Facsimile (414) 297-4900

Dated:  February 23, 2007

DB02:5801432.1

048032.1014

# EXHIBIT A

## COORDINATION AGREEMENT

This Coordination Agreement (the "Coordination Agreement" or "Agreement") is made and entered into as of this 23rd day of March, 1995, among Law Access, Inc., a nonstock corporation organized under the laws of the State of Delaware and doing business as The Access Group ("LAI"); Pennsylvania Higher Education Assistance Agency, an agency of the Commonwealth of Pennsylvania ("PHEAA"); Massachusetts Higher Education Assistance Corporation, a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts and doing business as American Student Assistance Guarantor ("ASA"); The Education Resources Institute, Inc., a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts ("TERI"); and Society National Bank, a national banking association organized under the laws of the United States ("Society").

WHEREAS, the parties hereto wish to increase opportunities for higher education; and

WHEREAS, the parties hereto acknowledge that many graduate and professional students need loans to finance their educations and after graduation need loans to finance educational expenses related to further study to meet professional qualification requirements and to consolidate their educational debts; and

WHEREAS, LAI is organized to assist students in attaining graduate and professional educations; and

WHEREAS, LAI administers the "Law Access℠ Loan Program", whereby law students may apply for loans to finance their educations (including studying for the bar exam) and law school graduates may apply for loans to finance educational expenses related to studying for the bar exam and to consolidate their educational debts; and

WHEREAS, LAI administers the "Business Access℠ Loan Program", whereby graduate business students may apply for loans to finance their educations and to consolidate their federal educational debts; and

WHEREAS, LAI intends to administer a "Medical Access℠ Loan Program", whereby medical students may apply for loans to finance their educations (including residencies) and to consolidate their federal educational debt; a "Dental Access℠ Loan Program", whereby dental students may apply for loans to finance their educations and to consolidate their federal educational debt; and a "Graduate Access℠ Loan Program", whereby other graduate students may apply for loans to finance their educations and to consolidate their federal educational debt; and

950328-13

WHEREAS, LAI, may in the future administer additional programs, whereby graduate or professional students in other particular disciplines may obtain such loans; and

WHEREAS, the other parties hereto wish to participate in LAI's 1995-1996 Programs, 1996-1997 Programs and 1997-1998 Programs (as hereinafter defined);

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

# ARTICLE I

## PURPOSE

**Section 1.1.** The purpose of this Agreement is to set forth the agreements of the parties and their relationships with respect to the overall operation of the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs. The "1995-1996 Programs" means The Access Group Programs and, to the extent that the other parties hereto agree to participate in such programs, any other programs administered by LAI to provide education loans to graduate and professional students, as they relate to the following Loans:

(a) Stafford Loans, LAL Loans, BAL Loans, MAL Loans, DAL Loans and GAL Loans to be used for educational expenses for enrollment periods that end on or after July 1, 1995 and on or before June 30, 1996 or for enrollment periods that are not standard academic terms if the Applications for such Loans are received before the earlier of June 30, 1996 or the time that applications for the 1996-1997 Programs are available,

(b) BEL Loans for which Applications are received at the Designated Address on or after July 1, 1995 and on or before June 30, 1996,

(c) Residency Loans for which Applications are received at the Designated Address on or after August 1, 1995 and on or before July 31, 1996; and

(d) Consolidation Loans for which the initial contact with a potential borrower is entered by the Servicer into its consolidation log on or after July 1, 1995 and on or before June 30, 1996, and which are otherwise eligible for origination by the Lender pursuant to Section 8.1.

The "1996-1997 Programs" means The Access Group Programs as they relate to the following Loans:

(e) Stafford Loans, LAL Loans, BAL Loans, MAL Loans, DAL Loans and GAL Loans to be used for educational expenses for enrollment periods that end on or after July 1, 1996 and on or before June 30, 1997 or for enrollment periods that are not standard academic terms if the Applications for such Loans are received before the earlier of June 30, 1997 or the time that applications for the 1997-1998 Programs are available,

(f)  BEL Loans for which Applications are received at the Designated Address on or after July 1, 1996 and on or before June 30, 1997,

(g)  Residency Loans for which Applications are received at the Designated Address on or after August 1, 1996, and on or before July 31, 1997, and

(h)  Consolidation Loans for which the initial contact with a potential borrower is entered by the Servicer into its consolidation log on or after July 1, 1996 and on or before June 30, 1997, and which are otherwise eligible for origination by the Lender pursuant to Section 8.1.

The "1997-1998 Programs" means The Access Group Programs as they relate to the following Loans:

(i)  Stafford Loans, LAL Loans, BAL Loans, MAL Loans, DAL Loans and GAL Loans to be used for educational expenses for enrollment periods that end on or after July 1, 1997 and on or before June 30, 1998 or for enrollment periods that are not standard academic terms if the Applications for such Loans are received before the earlier of June 30, 1998 or the time that applications for the next year's program are available,

(j)  BEL Loans for which Applications are received at the Designated Address on or after July 1, 1997 and on or before June 30, 1998,

(k)  Residency Loans for which Applications are received at the Designated Address on or after August 1, 1997, and on or before July 31, 1998, and

(l)  Consolidation Loans for which the initial contact with a potential borrower is entered by the Servicer into its consolidation log on or after July 1, 1997 and on or before June 30, 1998, and which are otherwise eligible for origination by the Lender pursuant to Section 8.1.

This Agreement also sets forth the agreements of the parties and their relationships with respect to the operation of the Federal Consolidation Loan and Private Consolidation Loan programs after July 1, 1995, and shall govern the assignment of Consolidation Loans to lenders in subsequent years (including for Loans to be consolidated which were originated pursuant to the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs).

<u>Section 1.2</u>.    This Agreement will be supplemented by the more detailed provisions of certain other agreements between and among the various parties (referred to herein as the "Related Agreements").

One-3

[The next page is Two-1]

# ARTICLE II

## DEFINITIONS

"ASA Certificate of Comprehensive Insurance" means the Certificate of Comprehensive Insurance for federal consolidation loans made in accordance with the Act issued to Society as of December 21, 1992, attached hereto as Exhibit I, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"ASA Federal Guarantee Agreement" means the Guarantee Agreement between Society and ASA, dated as of December 21, 1992, attached hereto as Exhibit H, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"ASA Remote Time-Sharing Services Agreement" means the Electronic Product Users Agreement between ASA and LAI, dated as of March 23, 1995, attached hereto as Exhibit L, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"The Access Group Programs" means the Law Access℠ Loan Program, the Business Access℠ Loan Program, the Medical Access℠ Loan Program, the Dental Access℠ Loan Program and the Graduate Access℠ Loan Program.

"Act" means the Higher Education Act of 1965, 20 U.S.C. §1001 et seq., as amended or supplemented from time to time, and all regulations promulgated thereunder, as amended or supplemented from time to time.

"Applicant" means a person who applies for a Loan.

"Application" means a Federal Application, a LAL/BAL/GAL Loan Application, a MAL/DAL Loan Application, a BEL Loan Application, a Residency Loan Application, a Private Consolidation Loan Application or a Federal Consolidation Loan Application, as appropriate.

"BAL Loan" means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Business Access℠ Loan Program, for educational expenses at an Eligible Business School, (2) is Privately Guaranteed, (3) is neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit A attached hereto.

"BEL Loan" (a) means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Law Access℠ Loan Program, for educational expenses incurred while such Eligible Borrower is studying for the bar exam, (2) is Privately Guaranteed, (3) is

Two-1

neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit C, and (b) when used with respect to Consolidated Loans, includes similar loans made by Lender under prior years' Law Access℠ Loan Programs.

"BEL Loan Application" means the BEL Loan Application, including a promissory note for the BEL Loan, in substantially the form attached hereto as Exhibit C.

"Business Access℠" is a service mark of LAI.

"Business Access℠ Loan Program" means the program administered by LAI to provide Loans to students at graduate business schools.

"Business Day" means a day of the year other than a Saturday, a Sunday or a day on which banks located in Harrisburg, Pennsylvania, Wilmington, Delaware, Boston, Massachusetts or Cleveland, Ohio are required or authorized by law to remain closed.

"Consolidated Loans" means those obligations of an Eligible Borrower which have been or are to be paid and discharged by the proceeds of his/her Private Consolidation Loan or Federal Consolidation Loan, as the context dictates.

"Consolidation Loan" means a Federal Consolidation Loan or a Private Consolidation Loan.

"DAL Loan" means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Dental Access℠ Loan Program, for educational expenses at an Eligible Dental School, (2) is Privately Guaranteed, (3) is neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit B attached hereto.

"Dental Access℠" is a service mark of LAI.

"Dental Access℠ Loan Program" means the program administered by LAI to provide Loans to dental students.

"Deposit Agreements" means the 1995 Deposit Agreement, the 1996 Deposit Agreement and the 1997 Deposit Agreement, each dated as of December 21, 1992, and the four Deposit Agreements, each dated as of March 23, 1995, between Society and TERI, including any supplements thereto or amendments thereof entered into in accordance with the provisions thereof and hereof.

"Designated Address" means (i) when used with respect to receipt of Applications by mail, P.O. Box 7400, Wilmington, Delaware 19803-0400 or such other address within the continental United States as may be designated by LAI, and (ii) when used with

respect to electronic transmission of Application data, LAI's computer facilities through a gateway provided by Mead Data Central, Inc. or such other provider(s) as LAI may select from time to time with the consent of each Lender, which shall not be unreasonably withheld.

"Eligible Borrower" has the meaning set forth in Article IV.

"Eligible Business School" means a school which qualifies as an Eligible Institution (or is a part of an Eligible Institution) under Section 435 of the Act and which is either (i) a graduate business school located in the United States or Puerto Rico that is accredited by the American Assembly of Collegiate Schools of Business ("AACSB"), (ii) a graduate business school that qualifies as an Eligible Graduate School and is a candidate for accreditation by the AACSB, (iii) included in the list of Eligible Business Schools attached hereto as Exhibit V, as such list may be amended from time to time, or (iv) only with respect to an Applicant who is enrolled in such a joint degree program, a non-business school participating in an arrangement with a business school described in clauses (i), (ii) or (iii) pursuant to which a joint degree program (including a business degree from such school and another degree from such non-business school) is offered.

"Eligible Dental School" means a school which qualifies as an Eligible Institution (or is part of an Eligible Institution) under Section 435 of the Act and which is an American Association of Dental Schools - accredited dental school located in the United States or Puerto Rico.

"Eligible Graduate School" means a graduate (i.e., post-baccalaureate) school located in the United States or Puerto Rico which qualifies as an Eligible Institution (or is a part of an Eligible Institution) under Section 435 of the Act and which is accredited by the New England Association of Schools and Colleges, the Southern Association of Colleges and Schools, the Northwest Association of Schools and Colleges, the North Central Association of Colleges and Schools, the Western Association of Schools and Colleges or the Middle States Association of Colleges and Schools.

"Eligible Institution" means an institution of higher education which qualifies as an "eligible institution" under Section 435 of the Act.

"Eligible Law School" means a school which qualifies as an Eligible Institution (or is a part of an Eligible Institution) under Section 435 of the Act and which is either (i) an American Bar Association-approved law school located in the United States or Puerto Rico, which is a member of LAI, or (ii) only with respect to an Applicant who is enrolled in such a joint degree program, a non-law school participating in an arrangement with a law school

described in clause (i) pursuant to which a joint degree program (including a law degree from such law school and another degree from such non-law school) is offered.

"Eligible Loan" means a loan which qualifies as an "eligible loan" under Section 438(b)(5) of the Act.

"Eligible Medical School" means a school which qualifies as an Eligible Institution (or is part of an Eligible Institution) under Section 435 of the Act and which is either (i) a Liaison Committee on Medical Education-accredited or American Osteopathic Association - accredited medical school located in the United States or Puerto Rico, or (ii) only with respect to an Applicant who is enrolled in such a joint degree program, a non-medical school participating in an arrangement with a medical school described in clause (i) pursuant to which a joint degree program (including a medical degree from such medical school and another degree from such non-medical school) is offered.

"Eligible School" means an Eligible Business School, Eligible Dental School, Eligible Graduate School, Eligible Law School, or Eligible Medical School, as the case may be.

"Federal Application" means the application or application/promissory note for Stafford Loans in the form required, approved or otherwise permitted by the United States Secretary of Education pursuant to the Act, including (in the case of an Applicant attending an Eligible Institution with which LAI has entered into an Electronic Application User Agreement in substantially the form attached hereto as Exhibit R) in the electronic format so required, approved or permitted.

"Federal Consolidation Loan" means a Loan which (1) a lender (including Society) makes to an Eligible Borrower (or, in the circumstances described in Section 4.6, to two married Eligible Borrowers) to pay and discharge certain of his or her eligible educational debts, (2) is Guaranteed, (3) is described as a federal consolidation loan in Section 428C of the Act, and (4) is evidenced by a promissory note in the form required or approved by the United States Secretary of Education pursuant to the Act.

"Federal Consolidation Loan Application" means the application or application/promissory note in the form required, approved or otherwise permitted by the United States Secretary of Education for Federal Consolidation Loans pursuant to the Act.

"GAL Loan" means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Graduate Access℠ Loan Program, for educational expenses at an Eligible Graduate School, (2) is Privately Guaranteed, (3) is neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit A attached hereto.

"Graduate Access℠" is a service mark of LAI.

"Graduate Access℠ Loan Program" means the program administered by LAI to provide Loans to graduate and professional students in disciplines other than law, business, medicine and dentistry (but which includes graduate nursing, pharmaceutical, podiatry, optometry, chiropractic and veterinary medicine students).

"Guarantee Agency" means either PHEAA or ASA.

"Guarantee" or "Guaranteed" means the guarantee by a Guarantee Agency of at least 98% of the principal of and accrued interest on a Loan and the coverage of such Loan by a reinsurance agreement with the U.S. Department of Education, providing for reimbursement to the Guarantee Agency of 78%, or such greater amount as may be provided by the Act, of the loss to the Guarantee Agency caused by a default on the Loan.

"LAL Loan" (a) means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Law Access℠ Loan Program, for educational expenses at an Eligible Law School, (2) is Privately Guaranteed, (3) is neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit A, and (b) when used with respect to Consolidated Loans and as used in Section 4.5, includes similar loans made by Lender under prior years' Law Access℠ Loan Programs.

"LAL/BAL/GAL Loan Application" means the LAL/BAL/GAL Loan Application, including a promissory note, in substantially the form included in Exhibit A attached hereto or (in the case of an Applicant attending an Eligible School with which LAI has entered into an Electronic Application User Agreement in substantially the form attached hereto as Exhibit R) in the electronic format to be developed, which will be substantially similar (with appropriate changes) to the electronic format represented by the record layout attached hereto as Exhibit F.

"Law Access℠" is a federally-registered service mark of LAI.

"Law Access℠ Loan Program" means the program administered by LAI to provide Loans to law students.

"Lender" means:  (a) when used with respect to MAL Loans and DAL Loans made under the 1995-1996 Programs, Wilmington Trust, and (b) when used with respect to all other Loans, Society.

"Loan" means any of a Stafford Loan, BAL Loan, LAL Loan, MAL Loan, DAL Loan, GAL Loan, Residency Loan, BEL Loan, Private Consolidation Loan or Federal Consolidation Loan.

"Loan Period" means a period of enrollment during which a Loan (other than a BEL Loan, a Residency Loan or a Consolidation Loan) is intended to be used for educational expenses.

"Loan Purchase Agreement" means the Commitment and Loan Sale Agreement, dated as of March 23, 1995, among Wilmington Trust, Society National Bank, Indiana and LAI, attached hereto as Exhibit Q.

"MAL Loan" means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Medical Access℠ Loan Program, for educational expenses at an Eligible Medical School, (2) is Privately Guaranteed, (3) is neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit B.

"MAL/DAL Loan Application" means the MAL/DAL Loan Application, including a promissory note, in substantially the form included in Exhibit B attached hereto or (in the case of an Applicant attending an Eligible School with which LAI has entered into an Electronic Application User Agreement in substantially the form attached hereto as Exhibit R) in the electronic format to be developed for the 1996-1997 Programs and the 1997-1998 Programs.

"Medical Access℠" is a service mark of LAI.

"Medical Access℠ Loan Program" means the program administered by LAI to provide Loans to medical students.

"1995-1996 Programs" has the meaning set forth in Section 1.1.

"1997-1998 Programs" has the meaning set forth in Section 1.1.

"1996-1997 Programs" has the meaning set forth in Section 1.1.

"Origination and Disbursement Agreement" means the Origination and Disbursement Agreement between PHEAA, Society, ASA, TERI and LAI, dated as of March 23, 1995, attached hereto as Exhibit G, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"PHEAA Consolidation Loan Guarantee Agreement" means the Guarantee Agreement for Consolidation Loans between Society and PHEAA, dated as of January 11, 1990, attached hereto as Exhibit K, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"PHEAA Federal Guarantee Agreement" means the PHEAA National Guaranty Loan Agreement between Society and PHEAA, dated

as of January 28, 1992, as amended as of December 21, 1992, attached hereto as Exhibit J, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"PHEAA Remote Time-Sharing Services Agreements" means the Remote Time-Sharing Services Agreement between PHEAA and Society, dated as of March 23, 1995, attached hereto as Exhibit M, and the Remote Time-Sharing Services Agreement between PHEAA and LAI, dated as of December 21, 1992, attached hereto as Exhibit N, including in each case any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"Private Consolidation Loan" means a loan which (1) a lender (including Lender) makes to an Eligible Borrower to retire such Eligible Borrower's existing LAL Loans, BEL Loans and/or prior Private Consolidation Loan, as applicable, (2) is Privately Guaranteed, and (3) is evidenced by a promissory note substantially in the form of Exhibit E.

"Private Consolidation Loan Application" means the Law Access℠ Private Consolidation Loan Application, including a promissory note for the Private Consolidation Loan, in substantially the form attached hereto as Exhibit E.

"Private Guarantee" or "Privately Guaranteed" means the guarantee of 100% of the principal of (including capitalized fees and interest) and accrued interest on a Loan provided by TERI without reinsurance from the U.S. Department of Education.

"Private Guarantee Agreement" means the Private Guarantee Agreement among TERI, Society, Wilmington Trust and Society National Bank, Indiana, dated as of March 23, 1995 attached hereto as Exhibit O, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"Related Agreements" means the Deposit Agreements, the Security Agreements, the Remote Time-Sharing Services Agreements, the ASA Federal Guarantee Agreement, the ASA Certificate of Comprehensive Insurance, the Origination and Disbursement Agreement, the PHEAA Consolidation Loan Guarantee Agreement, the PHEAA Federal Guarantee Agreement, the Private Guarantee Agreement, the Loan Purchase Agreement, the Servicing Agreement and the Remote Origination Agreement.

"Remote Origination Services Agreement" means the Remote Loan Origination and Disbursement Services Agreement between PHEAA and LAI, dated as of March 23, 1995, attached hereto as Exhibit Z, including any amendment thereof entered into in accordance with the provisions thereof and hereof.

"Remote Time-Sharing Services Agreements" means the ASA Remote Time-Sharing Services Agreement and the PHEAA Remote Time-Sharing Services Agreements.

"Residency Loan" means a loan which (1) Lender makes to an Eligible Borrower, pursuant to the Medical Access℠ Loan Program, for educational expenses incurred in connection with such Eligible Borrower's securing participation in a required residency program, (2) is Privately Guaranteed, (3) is neither Guaranteed nor an Eligible Loan, and (4) is evidenced by a promissory note substantially in the form included in Exhibit D.

"Residency Loan Application" means the Residency Loan Application, including a promissory note for the Residency Loan, in substantially the form attached hereto as Exhibit D.

"Security Agreements" means the 1995 Security Agreement, the 1996 Security Agreement and the 1997 Security Agreement, each dated as of December 21, 1992 and the four Security Agreements, each dated as of March 23, 1995, between TERI, as debtor, and Society, as secured party.

"Servicer" means PHEAA and any other organization with which Society has entered into a Servicing Agreement with respect to Loans under the 1995-1996 Programs, the 1996-1997 Programs and/or the 1997-1998 Programs.

"Servicing Agreement" means the Servicing Agreement, dated as of March 23, 1995, among PHEAA, Society and Society National Bank, Indiana, attached hereto as Exhibit P, including any supplement thereto or amendment thereof entered into in accordance with the provisions thereof and hereof.

"Stafford Loan" means a Subsidized Stafford Loan or an Unsubsidized Stafford Loan.

"Subsidized Stafford Loan" means a loan which (1) Lender makes to an Eligible Borrower for educational expenses in connection with attendance at an Eligible Institution, (2) is Guaranteed, (3) is described as a Federal Stafford Loan in Section 421(c) of the Act, (4) is an Eligible Loan, and (5) is evidenced by a promissory note in the form required or approved by the United States Secretary of Education pursuant to the Act.

"Unsubsidized Stafford Loan" means a loan which (1) Lender makes to an Eligible Borrower for educational expenses in connection with attendance at an Eligible Institution, (2) is Guaranteed, (3) is made pursuant to Section 428H of the Act, (4) is an Eligible Loan, and (5) is evidenced by a promissory note in the form required or approved by the United States Secretary of Education pursuant to the Act.

"Wilmington Trust" means Wilmington Trust Company, a banking corporation organized pursuant to the laws of the State of Delaware.

Unless the context shall clearly indicate otherwise, or may otherwise require, in this Agreement the terms "herein", "hereunder", "hereby", "hereto", "hereof" and any similar terms refer to this Agreement as a whole and not to any particular article, section or subdivision hereof.

Unless the context shall clearly indicate otherwise, or may otherwise require, in this Agreement: (i) references to articles, sections and other subdivisions, whether by number or letter or otherwise, are to the respective or corresponding articles, sections or subdivisions of this Agreement as such articles, sections or subdivisions may be amended from time to time; (ii) references to articles, chapters, subchapters and sections of any public law or statute of any State or of the United States, are to the respective or corresponding chapters, subchapters, sections and statutes as they may be amended from time to time; and (iii) the word "heretofore" means before the date of execution of this Agreement, the word "now" means at the date of execution of this Agreement, and the word "hereafter" means after the date of execution of this Agreement.

[The next page is Three-1]

# ARTICLE III

## DESCRIPTION OF LOANS

Section 3.1. Through the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs, Lenders will provide Stafford Loans, Consolidation Loans, LAL Loans, BAL Loans, MAL Loans, DAL Loans, GAL Loans, BEL Loans and Residency Loans to Eligible Borrowers. The Stafford Loans are generally described in the Act. The Federal Consolidation Loans are generally described in the Act and the brochures attached hereto as Exhibit T. The LAL, BAL, MAL, DAL and GAL Loans are generally described in the consumer information booklets accompanying the LAL/BAL/GAL Loan Application and the MAL/DAL Loan Application attached hereto as Exhibit U. The BEL Loans are generally described in the BEL Loan Application and promissory note attached hereto as Exhibit C. The Residency Loans are generally described in the Residency Loan Application and promissory note attached hereto as Exhibit D. The Private Consolidation Loans are generally described in the Private Consolidation Loan Application and promissory note attached hereto as Exhibit E. Certain terms of the LAL, BAL, MAL, DAL, GAL, BEL, Residency and Private Consolidation Loans are set forth in Exhibit S.

Section 3.2. Society will provide Stafford Loans, up to the maximum available to an Eligible Borrower under the Act, on the terms set forth in the Act (including the "applicable rates" provided by the Act), except that the interest rate on all Unsubsidized Stafford Loans prior to the commencement of repayment (treating, for this purpose, repayment as having commenced notwithstanding deferment pursuant to Section 428(b)(1)(M) of the Act) shall be 25 basis points below the "applicable rate" under the Act or such other rate (not in excess of the "applicable rate") as agreed upon by Society and LAI. In the event Society and LAI agree upon a different rate, LAI shall notify the Servicer and each Guarantee Agency at least 30 days prior to the effective date of such other rate. In addition, for Eligible Borrowers commencing repayment on or after January 1, 1996, (i) the interest rates on Guaranteed Loans to Eligible Borrowers who have not, at any time during the first 48 months of repayment, been more than 15 days delinquent in making any payment (or who have met such other repayment standards as may be agreed upon by Society, LAI and the Servicer) shall be reduced by 2% per annum (in the case of Stafford Loans) or 1% per annum (in the case of Federal Consolidation Loans), as the case may be (or such other amount as may be agreed upon by Society and LAI), commencing with the 49th month of repayment and continuing for so long as the Eligible Borrower does not, at any time, become more than 15 days delinquent in making any payment and (ii) the interest rate on Stafford Loans and Federal Consolidation Loans to Eligible Borrowers who agree to have their payments made automatically through automated clearinghouse services shall, for so long as such payments are made as agreed, be

reduced by 0.25% per annum or such other amount as may be agreed upon by Society and LAI.    The provision for the reduction of interest rates set forth in clause (ii) of the preceding sentence shall be implemented by the Servicer as soon as practicable, but in no event later than July 1, 1996.    Interest on Unsubsidized Stafford Loans that accrues prior to the commencement of repayment and is not paid by the Eligible Borrower shall be capitalized once, immediately prior to the commencement of repayment.

        Section 3.3.    Forbearances may (and where required by the Act, shall) be granted pursuant to the Act, the Servicing Agreement and the forbearance policy included in Exhibit Y, as amended from time to time.

        Section 3.4.    Society will provide Federal Consolidation Loans to Eligible Borrowers on the terms set forth in the Act and, in cases where the Act provides a choice of terms, on the terms established by Society with the consent of LAI.    Subject to the conditions set forth in this Agreement, each Eligible Borrower may apply for a Federal Consolidation Loan to pay the sum of the unpaid principal and accrued unpaid interest and late charges of all the loans eligible for consolidation under the Act which the borrower has selected for consolidation.

        Section 3.5.    Society will offer LAL Loans on the terms set forth in the promissory note accompanying the LAL/BAL/GAL Loan Application attached hereto as Exhibit A.    Each Eligible Borrower may receive one or more LAL Loans so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the borrower is solely or jointly liable), $120,000.    Each LAL Loan may include the Private Guarantee fee in the amount borrowed.

        Section 3.6.    Society will offer BAL Loans on the terms set forth in the promissory note accompanying the LAL/BAL/GAL Loan Application attached hereto as Exhibit A.    Each Eligible Borrower may receive one or more BAL Loans so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the borrower is solely or jointly liable), $120,000.    Each BAL Loan may include the Private Guarantee fee in the amount borrowed.

        Section 3.7.    Society will offer GAL Loans on the terms set forth in the promissory note accompanying the LAL/BAL/GAL Loan Application attached hereto as Exhibit A.    Each Eligible Borrower may receive one or more GAL Loans so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the

borrower is solely or jointly liable), $120,000. Each GAL Loan may include the Private Guarantee fee in the amount borrowed.

Section 3.8. Pursuant to the Loan Purchase Agreement, Wilmington Trust has agreed to offer MAL Loans under 1995-1996 Programs on the terms set forth in the promissory note accompanying the MAL/DAL Loan Application attached hereto as Exhibit B. Under the 1996-1997 Programs and the 1997-1998 Programs, Society will offer MAL Loans on the terms set forth in the promissory note accompanying the MAL/DAL Loan Application attached hereto as Exhibit B. Each Eligible Borrower may receive one or more MAL Loans so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the borrower is solely or jointly liable), $165,000. Each MAL Loan may include the Private Guarantee fee in the amount borrowed.

Section 3.9. Pursuant to the Loan Purchase Agreement, Wilmington Trust has agreed to offer DAL Loans under the 1995-1996 Programs on the terms set forth in the promissory note accompanying the MAL/DAL Loan Application attached hereto as Exhibit B. Under the 1996-1997 and 1997-1998 Programs, Society will offer DAL Loans on the terms set forth in the promissory note accompanying the MAL/DAL Loan Application attached hereto as Exhibit B. Each Eligible Borrower may receive one or more DAL Loans so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the borrower is solely or jointly liable), $135,000. Each DAL Loan may include the Private Guarantee fee in the amount borrowed.

Section 3.10. Society will offer BEL Loans on the terms set forth in the form for the BEL Loan promissory note attached hereto as Exhibit C. Each Eligible Borrower may submit an application for one or more BEL Loans in an aggregate principal amount not to exceed $5,000 at any time commencing six months prior to the Eligible Borrower's graduation from law school and terminating one month after such graduation from law school, so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the borrower is solely or jointly liable), $125,000. Each BEL Loan may include the Private Guarantee fee and the origination fee in the amount borrowed as long as the total amount borrowed does not exceed $5,000.

Section 3.11. Society will offer Residency Loans on the terms set forth in the form for the Residency Loan promissory note attached hereto as Exhibit D. Each Eligible Borrower may submit an application for one or more Residency Loans in an aggregate

Three-3

principal amount not to exceed $8,000 at any time commencing with the Eligible Borrower's final year of medical school and terminating one month after graduation from medical school, so long as the total outstanding principal amount of debt incurred by the Eligible Borrower for educational purposes does not exceed, in the aggregate (including undergraduate borrowing and consolidation loans for which the borrower is solely or jointly liable), $173,000. Each Residency Loan may include the Private Guarantee fee in the amount borrowed as long as the total amount borrowed does not exceed $8,000.

Section 3.12. Society will offer Private Consolidation Loans on the terms set forth in the form for the "Law Access™ Private Consolidation Loan Promissory Note" attached as Exhibit E. Each Eligible Borrower may apply for one Private Consolidation Loan to pay the sum of the unpaid principal and accrued unpaid interest and late charges due on all LAL, BEL and/or Private Consolidation Loans obtained by the Eligible Borrower under the Law Access™ Loan Program for years 1990-1991 and thereafter; provided that an Eligible Borrower who has obtained a Private Consolidation Loan and thereafter has obtained one or more additional LAL or BEL Loan(s) may apply for a new Private Consolidation Loan.

Section 3.13. Through LAI, Society will disburse each Stafford Loan in two, three or four equal installments, as requested by the Eligible Institution or required by the Act, payable jointly to the Eligible Borrower and the Eligible Institution in which the Eligible Borrower is enrolled. Through LAI, Lender will disburse each LAL Loan, BAL Loan, MAL Loan, DAL Loan and GAL Loan in two, three or four installments (except that a Loan in an original principal amount of $2,000 or less, or a Loan to a borrower who has completed one-third or more of the Loan Period or who is borrowing for a Loan Period of five months or less, may be disbursed in a single disbursement), as requested by the Eligible Institution, payable to the Eligible Borrower. Through LAI, Society will disburse each BEL Loan and Residency Loan in one or more installments, payable to the Eligible Borrower. LAI will (except as otherwise provided in Section 428(b)(1)(N)(ii) of the Act with respect to students studying outside the United States) send all such Stafford, LAL, BAL, MAL, DAL and GAL Loan disbursement checks directly to the Eligible Institution or electronically transfer funds to the Eligible Institution and will send all such BEL Loan and Residency Loan disbursement checks directly to the Eligible Borrower. Through the Servicer, Society will disburse each Federal Consolidation Loan in one installment, the proceeds of which will be paid to the holder or holders of the Consolidated Loans to discharge the liability on such loans. The Servicer will send all disbursement checks (or electronically transfer funds) for Federal Consolidation Loans directly to the respective holders of each Consolidated Loan to be discharged.

Section 3.14. (A) Notwithstanding Sections 3.2 and 3.4 hereof, Society shall not be required to make a Subsidized Stafford Loan, an Unsubsidized Stafford Loan or a Federal Consolidation Loan, as the case may be, after the effective date of an amendment to the Act or any other law of the United States that (1) is enacted after the date of this Agreement and (2) changes the interest rates (including interest subsidies) on Subsidized Stafford Loans, Unsubsidized Stafford Loans or Federal Consolidation Loans, as the case may be, or methods of computing special allowance payments with respect thereto, in a manner which would cause Society to obtain a rate of return (including interest and special allowance payments) on such a loan disbursed pursuant to the Act after the effective date of such amendment or law which would be lower by more than one-quarter of one percent (.25%) than the rate of return on such loan under the Act as in effect on the date of this Agreement (such lower rate of return being referred to herein as a "Materially Lower Rate of Return").

"Rate of return" as used in this Section 3.14 with respect to any Stafford or Federal Consolidation Loan, shall mean the discount rate, determined on the basis of monthly compounding, which when used to compute the present value as of the computation date of all payments of principal, interest and special allowance payments to be paid on such student loan (less any rebate fees payable with respect to a Federal Consolidation Loan), produces an amount equal to the outstanding principal amount of such student loan plus accrued interest and special allowance payments as of the computation date, based on the following assumptions:

(i) all payments of principal, interest and special allowance payments will be received on the same day in each calendar month in which they are due; and

(ii) the 91-day Treasury bill rate to be used in determining such special allowance payment is equal to the bond equivalent rate of the 91-day U.S. Treasury bills auctioned at the most recent auction of 91-day U.S. Treasury bills preceding the computation date.

If LAI gives to Society written notice of an amendment to the Act or any other law enacted after the date of this Agreement (or written notice of a pending amendment to the Act or any such

other law) stating therein that the notice is given for the purpose of determining whether the amendment is one which would result in a Materially Lower Rate of Return, Society shall determine, within thirty (30) days following the receipt of such notice, whether the amendment will result in a Materially Lower Rate of Return.    If Society reasonably determines the amendment will result in a Materially Lower Rate of Return and gives LAI written notice to that effect within such 30-day period, its determination shall be binding on LAI and Society.  If Society fails within such 30-day period to give LAI the written notice described in the preceding sentence, or determines the amendment will not result in a Materially Lower Rate of Return, such amendment shall be conclusively presumed not to have resulted in a Materially Lower Rate of Return.

   (B) Notwithstanding Sections 3.5, 3.6, 3.7, 3.8, 3.9, 3.10 and 3.11, Society shall not be required to make a LAL, BAL, MAL, DAL, GAL, BEL or Residency Loan after the effective date of an amendment to the Act that terminates the Federal Family Education Loan Program; provided that Society shall be required to fund subsequent disbursements of any such Loan the first disbursement of which is made prior to the effective date of such amendment and any Loans for which the Application is received at the Designated Address on or prior to the date such an amendment is enacted.

## ARTICLE IV

## ELIGIBLE BORROWERS

Section 4.1.    Lenders will only make Loans to Eligible Borrowers.    To be an Eligible Borrower, an Applicant for a Stafford, LAL, BAL, MAL, DAL, GAL, BEL or Residency Loan must meet the applicable criteria set forth in this section.    To be an Eligible Borrower, an Applicant for a Federal Consolidation Loan must meet the criteria set forth in Section 4.6.  To be an Eligible Borrower, an Applicant for a Private Consolidation Loan must meet the criteria set forth in Section 4.8.  Credit criteria for certain types of Loans are specified in Sections 4.4 and 4.5.    Each Eligible Borrower for a Stafford, LAL, BAL, MAL, DAL, GAL, BEL or Residency Loan must:

(a)  be enrolled in, or admitted for enrollment in: (i) in the case of a LAL Loan, an Eligible Law School, (ii) in the case of a BAL Loan, an Eligible Business School, (iii) in the case of a MAL Loan, an Eligible Medical School, (iv) in the case of a DAL Loan, an Eligible Dental School, (v) in the case of a GAL Loan, an Eligible Graduate School, and (vi) in the case of a Stafford Loan, an Eligible School.

(b)  be enrolled, or enroll:  (i) in the case of a LAL Loan, as at least a half-time law student in a J.D., LL.M., J.S.D., or joint law degree program, (ii) in the case of a BAL Loan, in a graduate business or joint business degree or executive education program, (iii) in the case of a MAL Loan, as at least a half-time student in a M.D., D.O. or joint medical program, (iv) in the case of a DAL Loan, as at least a half-time student in a graduate dental program, (v) in the case of a GAL Loan, as at least a half-time student in a graduate or professional certificate or degree program not described in clauses (i) through (iv) above, and (vi) in the case of a Stafford Loan, as at least a half-time student in a program meeting the requirements of clauses (i), (ii), (iii), (iv) or (v) above,

(c)  be making satisfactory progress toward the completion of such a degree (or executive education program), according to the standards of the applicable Eligible Institution,

(d)  in lieu of (a), (b), and (c), in the case of a BEL Loan, be enrolled in or have graduated from an Eligible Law School and have applied for a BEL Loan (i.e., the BEL Loan Application has been both certified by the Eligible Institution and received at the

Four-1

Designated Address) within six months before or one month after his/her graduation from an Eligible Law School (except as otherwise provided in Section 4.2 hereof),

(e)    in lieu of (a), (b), and (c), in the case of a Residency Loan, be enrolled in or have graduated from an Eligible Medical School and have applied for a Residency Loan (i.e., the Residency Loan Application has been received at the Designated Address) during his/her last year of medical school or within one month after his/her graduation from an Eligible Medical School (except as otherwise provided in Section 4.2 hereof),

(f)    be a citizen or national of the U.S. or an alien lawfully admitted for permanent residence,

(g)    in the case of LAL, BAL, MAL, DAL, GAL, BEL or Residency Loans only, not already have outstanding the maximum amount of educational loans permitted by Section 3.5, 3.6, 3.7, 3.8, 3.9, 3.10 or 3.11, as applicable,

(h)    in the case of Stafford Loans only, not already have outstanding the maximum amount of loans allowed by the Act,

(i)    in the case of Stafford Loans only, not owe a refund on grants previously received at any institution under the Act, or be in default on any loan from a student loan fund at any institution provided for in the Act, or on a loan made, insured, or guaranteed by the U.S. Secretary of Education under the Act for attendance at any institution, or on any other education loan; provided, that an Applicant will not be ineligible as a result of a default on a loan (i) which loan was discharged or is dischargeable in a case pending under the Federal Bankruptcy Code, or (ii) which default occurred automatically as a result of the commencement of an action by or against the Applicant under the Federal Bankruptcy Code,

(j)    in the case of Stafford Loans only, have filed a Statement of Registration Status by which he/she certified that he/she is either registered with the Selective Service or, for a specific reason, is not required to be registered,

(k)    have requested a principal amount, for each type of Loan, of at least $500; provided that a Subsidized Stafford Loan and an Unsubsidized Stafford Loan shall be treated as a single loan for this purpose, so long as the principal amount of each individual Loan is at least $100, and

Four-2

(1)  in the case of Stafford Loans only, otherwise comply with any applicable requirements of the Act.

Section 4.2.    Lenders will not make a Stafford Loan, LAL Loan, MAL Loan, DAL Loan, GAL Loan or, in the case of an applicant who is enrolled on at least a half-time basis, BAL Loan in an amount greater than the Applicant's unmet educational expenses, as determined by the Eligible Institution attended by the Applicant. Society will not make a BAL Loan to an Applicant who is enrolled on a less than half-time basis in an amount greater than the Applicant's tuition and fees plus $500, as determined by the Eligible Institution attended by the Applicant.  Society will not make Stafford Loans to an Eligible Borrower unless the amount of each such Stafford Loan individually is at least $500; provided that a Subsidized Stafford Loan and an Unsubsidized Stafford Loan shall be treated as a single loan for this purpose, so long as the principal amount of each individual Loan is at least $100.  Lenders shall not make LAL, BAL, MAL, DAL, GAL, BEL or Residency Loans in a principal amount less than $500.  Society will not, except as described in the next sentence:

(A)  make a BEL Loan unless (i) at the time the Application is received by LAI, the Applicant is in his/her graduating year of law school and is within six months before graduation, or has graduated from an Eligible Law School during the preceding one-month period, and (ii) the Applicant has educational expenses related to studying for the bar exam, as certified by the Applicant, in at least the amount of the Loan sought, or

(B)  make a Residency Loan unless (i) at the time the Application is received by LAI, the Applicant is in his/her graduating year of medical school, or has graduated from an Eligible Medical School, during the preceding one-month period, and (ii) the Applicant has educational expenses related to a required residency program as certified by the Applicant, in at least the amount of the Loan sought.

Society agrees that it shall, at the request of LAI, make a BEL or Residency Loan to an otherwise eligible Applicant notwithstanding that the Application is received by LAI more than one month after the Applicant's graduation from an Eligible School if (a) LAI determines, in its discretion, that the failure to complete the Application within such time period was not the result of a lack of diligence on the part of the Applicant and (b) if the Application is received by LAI more than two months after the Applicant's graduation, TERI approves the making of such BEL or Residency Loan.

Section 4.3.    Society will not make a Subsidized Stafford Loan unless the Applicant meets the needs test established by the Act.

<u>Section 4.4</u>. Unless required by the Act, neither Society nor the Guarantee Agencies will require a credit report on a Stafford Loan Applicant; provided, that if the Act requires a credit report for only a certain class of Applicants for Subsidized Stafford Loans and/or Unsubsidized Stafford Loans, Society may require credit reports for all Applicants for such type(s) of Loan.

<u>Section 4.5</u>.

(a) The appropriate Lender shall obtain credit reports from an authorized credit reporting agency for each Applicant for a Privately Guaranteed Loan and, if required by the Act, each Applicant for a Stafford Loan. Such Loans shall be approved if the credit report for the Applicant shows no credit history or shows that the following criteria are met:

(i) in the case of LAL, BEL or Private Consolidation Loan Applicants who have obtained one or more LAL Loans under the 1993-1994 Law Access℠ Loan Program or earlier years' programs and (if required by the Act) in the case of all Stafford Loan Applicants:

(1) there is no more than one account currently rated 60 or more days delinquent at the time of the credit report;

(2) there are no more than two accounts that have been 60 or more days delinquent in the past two years;

(3) there is no account that has been delinquent 90 or more days in the past two years;

(4) there is no record of a paid or unpaid collection or charged-off account in the past two years;

(5) there is no record of a foreclosure, repossession, open judgment or suit, unpaid prior educational loan default or other negative public credit record items in the past six years;

(6) there is no record of a bankruptcy in the past seven years; and

(7) in the case of a Stafford Loan, any other credit criteria required under the Act;

Four-4

provided that, (A) in the case of Private Consolidation Loans, delinquencies with respect to the Consolidated Loans shall not be considered for purposes of items (1) through (3) above, and (B) in the case of Stafford Loans, no factors prohibited by the Act or the Federal Bankruptcy Code shall be considered; and

(ii) in the case of LAL, BEL or Private Consolidation Loan Applicants who have not obtained one or more LAL Loans under the 1993-1994 Law Access℠ Loan Program or earlier years' programs, and in the case of all BAL, MAL, DAL, GAL and Residency Loan Applicants:

    (1) there is no more than one account currently rated 60 or more days delinquent at the time of the credit report;

    (2) there are no more than two accounts that have been 60 or more days delinquent in the past two years;

    (3) there is no account that has been delinquent 90 or more days in the past five years;

    (4) there is no record of a paid or unpaid collection or charged-off account in the past two years;

    (5) there is no record of a foreclosure, repossession, open judgment or suit, unpaid prior educational loan default or other negative public credit record items in the past six years;

    (6) there is no record of a bankruptcy in the past seven years; and

    (7) there have been no more than three inquiries to the credit reporting agency in the past six months relating to the incurrence of debt by the Applicant;

provided that, in the case of Private Consolidation Loans, delinquencies with respect to the Consolidated Loans shall not be considered for purposes of items (1) through (3) above.

Credit reports listing accounts with a status of "Not Paid as Agreed" will be classified as delinquent 90 days. Applicants failing to qualify under the applicable standards listed in this subsection (a) shall be disapproved for a Privately Guaranteed Loan and, to the extent required by the Act, a Stafford Loan.

(b)  Society shall forward all documentation relating to credit approvals (including approvals made upon appeal pursuant to Section 4.7) to the Servicer, for safekeeping and retention as provided in Section 10.5.

(c)  Society may from time to time review the credit criteria and make any additions, deletions or amendments to the credit criteria set forth in subsection (a) of this Section 4.5, subject to the approval of LAI and TERI (and, in the case of changes applicable to MAL and/or DAL Loans under the 1995-1996 Programs, the approval of Wilmington Trust), and provided that such additions, deletions or amendments do not violate the Act.  If such additions, deletions or amendments are proposed, LAI and TERI (and, (i) in the case of changes applicable to MAL and/or DAL Loans under the 1995-1996 Programs, Wilmington Trust, or (ii) if such additions, deletions or amendments relate to Stafford Loans, PHEAA and ASA) shall each have ten Business Days to submit written comments on such proposal. No additions, deletions or amendments to the credit criteria, however, shall be implemented without the prior written approval of LAI, Society and TERI (and, in the case of changes applicable to MAL and/or DAL Loans under the 1995-1996 Programs, the approval of Wilmington Trust).

Section 4.6.    Each Eligible Borrower for a Federal Consolidation Loan (or the spouse of such Eligible Borrower in the case of an Eligible Borrower obtaining a Federal Consolidation Loan on a joint and several basis with his/her spouse) must:

(a)  have attended an Eligible School,

(b)  be in repayment status, or in a grace period preceding repayment, or be a defaulted Borrower who has made satisfactory arrangements to repay the defaulted loans,

(c)  not already have received a federal consolidation loan under the Act, unless the borrower now seeks to (i) consolidate eligible indebtedness incurred after the date of receipt of his/her federal consolidation loan, or (ii) add loans received before the date of receipt of his/her Federal Consolidation Loan, but not originally consolidated, within 180 days after

Four-6

the date of receipt of his/her Federal Consolidation Loan,

(d) certify (i) that he/she has no other application pending for a federal consolidation loan under the Act and (ii) unless Society holds an outstanding loan of that borrower which the borrower has selected for consolidation, that he/she has sought and has been unable to obtain a federal consolidation loan from the holders of the outstanding loans of that borrower (which are so selected for consolidation), and

(e) agree to notify the holder of the Federal Consolidation Loan promptly of any change of address;

provided, however, that in the case of an Eligible Borrower and his/her spouse applying for a Federal Consolidation Loan on a joint and several basis, each spouse must meet the requirements of (d)(i) and (e); and provided further, however, that the requirements listed in (b) through (e) shall be revised from time to time if necessary to make such requirements consistent with the Act.

Section 4.7. If a Loan Application is denied by the Lender, the Lender will notify the Applicant that he/she may call a credit bureau to receive a copy of the credit report received by Lender and that he/she may appeal the decision by notifying Lender in writing of such appeal within 60 days. Each Lender shall provide an appeal procedure for such rejected Applicants in accordance with guidelines set forth in the credit review appeal policy included in Exhibit Y, as amended from time to time, and, in the case of Stafford Loans, the additional requirements of the Act, if any. Lender will notify each Applicant of each appeal decision. Lender will also notify LAI of Applicants who have appealed a rejection within two Business Days after such appeal and of the results of credit checks and appeals as provided in Section 9.3. All correspondence with Applicants pursuant to this Section 4.7 will identify the applicable Lender.

Section 4.8. Each Eligible Borrower for a Private Consolidation Loan must have one or more outstanding loans which:

(a) are LAL Loans, BEL Loans or (under the circumstances described in Section 3.12 hereof) Private Consolidation Loans;

(b) were obtained under the Law Access℠ Loan Program for years 1990-1991 or later; and

(c) have an aggregate outstanding payoff balance (including accrued interest and late charges) of at least $7,500.

An Eligible Borrower must consolidate all of his/her loans that are eligible for consolidation.   To obtain a Private Consolidation Loan, an Eligible Borrower must be in repayment status on all of his/her LAL, BEL and/or Private Consolidation Loans and must not be more than 45 days delinquent in any payment due with respect to any such Loan.  An Eligible Borrower's delinquency shall be measured as of the date of receipt by the Servicer of a completed, signed Application; provided that the delinquency of any Eligible Borrower who does not meet this requirement as of such date may be measured on such later date within 60 days of receipt of the Application as the Eligible Borrower does meet this requirement.

<u>Section 4.9.</u>   No  Eligible  Borrower  may  obtain  a Privately Guaranteed Loan under more than one The Access Group Program  for  the  same  Loan  Period.    In  the  event  an  Eligible Borrower meets the eligibility requirements for more than one The Access Group Program, he/she may choose the program with the most favorable terms.

<u>Section 4.10.</u>  LAI agrees to use its best efforts to obtain, within 90 days before the commencement of each program year, a list of accredited or approved schools (or, in the case of business  schools,  candidates  for  accreditation)  from  each accrediting body referred to in the definitions of "Eligible Law School," "Eligible Business School," "Eligible Medical School," "Eligible Dental School," and "Eligible Graduate School," and to provide copies of each such list to the other parties hereto.   In addition, LAI may obtain (directly or through one or more schools) statements  from  any  such  bodies  as  to  the  accreditation  of additional schools from time to time.  In processing Applications, LAI shall be entitled to rely conclusively upon the most recently obtained lists, and upon any such statement containing more recent data which it has received.

Four-8

[The next page is Five-1]

ARTICLE V

MAKING LOANS

Section 5.1.  Subject to such limitations as are set forth in this Agreement or in the Act: (i) commencing on May 1, 1995, Society will make a Subsidized Stafford Loan and/or an Unsubsidized Stafford Loan to any Eligible Borrower who has completed a Federal Application seeking a Loan under the 1995-1996 Programs, (ii) commencing on April 1, 1996, Society will make a Subsidized Stafford Loan and/or an Unsubsidized Stafford Loan to any Eligible Borrower who has completed a Federal Application seeking a Loan under the 1996-1997 Programs and (iii) commencing on April 1, 1997, Society will make a Subsidized Stafford Loan and/or an Unsubsidized Stafford Loan to any Eligible Borrower who has completed a Federal Application seeking a Loan under the 1997-1998 Programs.  Subject to such limitations as are set forth in this Agreement or the Act: (a) commencing on July 1, 1995, Society will make a Federal Consolidation Loan to any Eligible Borrower who has completed a Federal Consolidation Loan Application for the 1995-1996 Programs, (b) commencing on July 1, 1996, Society will make a Federal Consolidation Loan to any Eligible Borrower who has completed a Federal Consolidation Loan Application for the 1996-1997 Programs and (c) commencing on July 1, 1997, Society will make a Federal Consolidation Loan to any Eligible Borrower who has completed a Federal Consolidation Loan Application for the 1997-1998 Programs; provided in any case that such Loan is eligible for origination by Society pursuant to Section 8.1.

Section 5.2.   (A) Subject to such limitations as are set forth in this Agreement:

(i)  commencing on May 1, 1995, Society will make (a) a LAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a LAL Loan under the 1995-1996 Programs, (b) a BAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a BAL Loan under the 1995-1996 Programs and (c) a GAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a GAL Loan under the 1995-1996 Programs;

(ii) commencing on May 1, 1995, Wilmington Trust has agreed pursuant to the Loan Purchase Agreement to make (a) a MAL Loan to any Eligible Borrower who has completed a MAL/DAL Loan Application seeking a MAL Loan under the 1995-1996 Programs, and (b) a DAL Loan to any Eligible Borrower who has completed a MAL/DAL Loan Application seeking a DAL Loan under the 1995-1996 Programs;

(iii)   commencing on April 1, 1996, Society will make (a) a LAL Loan to any Eligible Borrower who has

Five-1

completed a LAL/BAL/GAL Loan Application seeking a LAL Loan under the 1996-1997 Programs, (b) a BAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a BAL Loan under the 1996-1997 Programs, (c) a MAL Loan to any Eligible Borrower who has completed a MAL/DAL Loan Application seeking a MAL Loan under the 1996-1997 Programs, (d) a DAL Loan to any Eligible Borrower who has completed a MAL/DAL Loan Application seeking a DAL Loan under the 1996-1997 Programs and (e) a GAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a GAL Loan under the 1996-1997 Programs; and

(iv) commencing on April 1, 1997, Society will make (a) a LAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a LAL Loan under the 1997-1998 Programs, (b) a BAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a BAL Loan under the 1997-1998 Programs, (c) a MAL Loan to any Eligible Borrower who has completed a MAL/DAL Loan Application seeking a MAL Loan under the 1997-1998 Programs, (d) a DAL Loan to any Eligible Borrower who has completed a MAL/DAL Loan Application seeking a DAL Loan under the 1997-1998 Programs and (e) a GAL Loan to any Eligible Borrower who has completed a LAL/BAL/GAL Loan Application seeking a GAL Loan under the 1997-1998 Programs.

(B)    Subject to such limitations as are set forth in this Agreement:

(i)  commencing on July 1, 1995, Society will make (a) a BEL Loan to any Eligible Borrower who has completed a BEL Loan Application seeking a BEL Loan for the 1995-1996 Programs, and (b) a Private Consolidation Loan to any Eligible Borrower who has completed a Private Consolidation Loan Application for the 1995-1996 Programs;

(ii) commencing on July 1, 1996, Society will make (a) a BEL Loan to any Eligible Borrower who has completed a BEL Loan Application seeking a BEL Loan for the 1996-1997 Programs, and (b) a Private Consolidation Loan to any Eligible Borrower who has completed a Private Consolidation Loan Application for the 1996-1997 Programs; and

(iii) commencing on July 1, 1997, Society will make (a) a BEL Loan to any Eligible Borrower who has completed a BEL Loan Application seeking a BEL Loan for the 1997-1998 Programs, and (b) a Private Consolidation Loan to any Eligible Borrower who has completed a Private

Consolidation Loan Application for the 1997-1998 Programs.

(C) Subject to such limitations as are set forth in this Agreement:

(i) commencing on August 1, 1995, Society will make a Residency Loan to any Eligible Borrower who has completed a Residency Loan Application seeking a Residency Loan for the 1995-1996 Programs;

(ii) commencing on August 1, 1996, Society will make a Residency Loan to any Eligible Borrower who has completed a Residency Loan Application seeking a Residency Loan for the 1996-1997 Programs; and

(iii) commencing on August 1, 1997, Society will make a Residency Loan to any Eligible Borrower who has completed a Residency Loan Application seeking a Residency Loan for the 1997-1998 Programs.

(D) Except as provided in Section 3.14(B), Lenders will make a LAL, BAL, MAL, DAL, GAL, BEL, Residency or Private Consolidation Loan as provided herein without regard to whether the Eligible Borrower also applies for or receives a Stafford or Federal Consolidation Loan or to whether the Eligible School participates in the Federal Family Education Loan Program under the Act.

Section 5.3. Society will make Loans (other than Consolidation Loans) to Eligible Borrowers in accordance with this Agreement, up to an aggregate original principal amount (i.e., excluding accrued interest and additional guarantee fees to be added to principal at repayment) of $2,200,000,000. Society will make Consolidation Loans to Eligible Borrowers in accordance with this Agreement without a limit on the aggregate principal amount. Subject to the limitations set forth in this Agreement or in the Act, Society will make Loans to Eligible Borrowers on a first-come, first-served basis until this aggregate principal amount is reached. Other than this aggregate principal amount and except as specified elsewhere in this Agreement or in the Act, there is no aggregate dollar limit on any type of Loan or Loans to be made by Lenders.

Section 5.4. Society shall be entitled to hold the origination fee provided by the Act for each Stafford Loan made pursuant to this Agreement until such fee is due to the U.S. Department of Education. Society shall deduct the fee proportionately from each Stafford Loan disbursement in accordance with the disbursement roster provided by LAI. Society shall reduce the amount of interest and special allowance it requests from the U.S. Department of Education under Sections 428(a)(3)(A) and 438(b)

of the Act by the amount of such origination fees relating to Subsidized Stafford Loans, as required under the Act. Society shall pay such origination fees relating to Unsubsidized Stafford Loans directly to the U.S. Department of Education, or, if permitted by the U.S. Department of Education, shall reduce the amount of interest and special allowance it requests by the amount of such origination fees. Society acknowledges that the Act does not currently allow a lender to charge an origination fee on a Federal Consolidation Loan.

Section 5.5. Society may charge an origination fee of four-tenths of one percent (0.40%) of the principal amount of each BEL Loan, which Society shall deduct from the amount of loan proceeds paid to the Eligible Borrower in accordance with the disbursement roster provided by LAI. Lenders shall not charge any origination fee for LAL, BAL, MAL, DAL, GAL, Residency or Private Consolidation Loans. The applicable Lender shall add the additional fee described in Section 9.2 to the principal amount of each LAL, BAL, MAL, DAL, GAL, BEL and Residency Loan immediately prior to the time it enters repayment.

Section 5.6. Lenders shall not charge borrowers any fees other than the origination fees, guarantee fees and late charges specifically provided for hereunder (or specifically provided for in the Application).

Section 5.7. No cosigners shall be allowed or required for any Loans, unless otherwise required by the Act. If the Act requires that a Stafford Loan not be made without a cosigner (based on the results of a credit report on an Applicant), such Applicant will be denied a Stafford Loan, unless the Act prohibits such a denial. Notwithstanding the foregoing, Federal Consolidation Loans may be made to married couples on a joint and several basis as described in Section 4.6 hereof.

Five-4

[The next page is Six-1]

ARTICLE VI

PROMOTION, APPLICATION DISTRIBUTION AND PROCESSING

Section 6.1.    LAI will publicize the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs through the preparation and distribution of materials and the presentation of workshops, conferences and/or seminars relating to the programs for financial aid officers at Eligible Schools and/or for Eligible Borrowers.    LAI  will  also  publicize  loan  consolidation opportunities under The Access Group Programs to students in their last year of study, recent graduates and others who request information by, among other things, brochures which LAI will distribute.    LAI agrees that all printed promotional materials relating specifically to the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs (but not those relating to Federal Consolidation Loans or generally to one or more of The Access Group Programs) shall identify the applicable Lender and include such Lender's mailing address.

Section 6.2.    LAI will be responsible for, and have the exclusive  right  to  conduct,  all  marketing  and  promotional activities (including training for financial aid personnel of Eligible Schools) for The Access Group Programs.  No other party to this Agreement shall prepare or distribute any materials or conduct any  other  promotional  activities  (including  such  training activities) pertaining to The Access Group Programs, use the term "Access" as a service mark in connection with the provision of education  financial  aid  services  (including  use  of  the federally-registered service mark "Law Access®" or the service marks "The Access Group℠," "Law Access℠," "Business Access℠," "Medical Access℠," "Dental Access℠" or "Graduate Access℠") or one confusingly similar to any of them, or use the miscellaneous design (mortar board) logo attached hereto as Exhibit W, or utilize, sell or transfer any list of borrowers derived from The Access Group Programs, without the prior written consent of LAI, except as provided in this Section 6.2.  LAI consents to the other parties' activities of explaining their respective roles in The Access Group Programs, and providing general program information to financial aid officers, provided that, in communications concerning the programs, such parties use only materials prepared, or approved in advance in writing, by LAI.  LAI acknowledges that it has consented to the limited use of the federally-registered service mark "Law Access®" and the service marks "The Access Group℠," "Law Access℠," "Business  Access℠,"  "Medical  Access℠,"  "Dental  Access℠"  and "Graduate Access℠" on standard forms used with The Access Group Programs and attached hereto as Exhibit X, pursuant to this Agreement, so long as the mark is clearly identified as a service mark of LAI.  So long as the term or the federally-registered service mark "Law Access®" or the service marks "The Access Group℠," "Law Access℠," "Business Access℠," "Medical Access℠," "Dental Access℠" or "Graduate Access℠" are not used in any way

Six-1

whatsoever without the prior written consent of LAI, Society shall have the right to send preprinted applications and other promotional materials and to solicit loan applications from Eligible Borrowers to whom it has made Stafford Loans or Federal Consolidation Loans, and to market any product or service of Society, its subsidiaries or affiliates (other than student loans), to any Eligible Borrower who has a Loan from either Lender pursuant to this Agreement. LAI agrees that Society, its subsidiaries and affiliates may market student loans to any of their customers or to any persons appearing on a list obtained from a third party not a party to this Agreement or any Related Agreements, who are also Applicants or Eligible Borrowers, provided that they do so without using any list of Applicants or Eligible Borrowers developed in connection with The Access Group Programs.

Society acknowledges that LAI shall have the right to send promotional materials and to solicit loan or other financial aid applications from any Eligible Borrower under the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs, whether or not he/she has received a Loan from a Lender; provided, however, that this right shall not entitle LAI to send such materials to, or solicit such applications from, Eligible Borrowers under the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs for consumer loans unrelated to the financing or refinancing of education and educational expenses. LAI agrees with Society that LAI shall not, without the consent of Society: (a) sell any list of Eligible Borrowers under the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs to a third party or (b) solicit Eligible Borrowers under the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs for the purpose of refinancing Loans made to such Eligible Borrowers under the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs, except as such solicitation is in connection with Consolidation Loans or other loans made under The Access Group Programs that include funds for new loans as well as refinancing of existing loans (as described in Section 12.22(B) hereof). Nothing in clause (a) of the preceding sentence, however, shall preclude or in any way limit LAI's use of any list of Eligible Borrowers under the 1995-1996 Programs, the 1996-1997 Programs and/or the 1997-1998 Programs in connection with The Access Group Programs or any other program which LAI operates or may operate in the future for the purpose of providing loans for the financing or refinancing (except as refinancing is limited by clause (b) of the preceding sentence) of education or educational expenses or providing other forms of financial aid.

Section 6.3. The parties acknowledge that LAI will prepare all marketing and promotional (including training) materials for the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs, including but not limited to:

(a) the LAL/BAL/GAL Loan Application;

(b)   the MAL/DAL Loan Application;

(c)   the BEL Loan Application;

(d)   the Residency Loan Application;

(e)   brochures summarizing The Access Group Programs, and brochures summarizing federal loan consolidation under The Access Group Programs; and

(f)   workshop, seminar and/or conference materials.

The parties also acknowledge that the Federal Application and the Federal Consolidation Loan Application will be in the forms required by the United States Secretary of Education.

Section 6.4.   Each Federal Application, LAL/BAL/GAL Loan Application, MAL/DAL Loan Application, BEL Loan Application and Residency Loan Application (except electronic applications, which shall direct the Applicant to submit the electronic data to the Designated Address) shall instruct the Applicant to submit a completed Application to the financial aid office of the Eligible Institution attended by the Applicant.   The Eligible Institution will review the completed Application, verify enrollment status and provide the additional information required by the Application, including information regarding educational costs and other aid awarded to the Applicant, if applicable.   The Eligible Institution will then forward the completed Application to the Designated Address.   For Consolidation Loans, LAI will refer inquiries about consolidation it receives from potential borrowers to the Servicer for follow-up as described in Section 8.1.

Section 6.5.   LAI has reviewed and approved for use the portions of the materials identified in Section 6.3 describing LAI or using LAI service marks.   ASA and PHEAA have reviewed and approved for use in their Guarantee programs the portions of such materials describing or documenting Stafford Loans and Federal Consolidation Loans.   Society and TERI have reviewed and approved for use the portions of such materials describing or documenting LAL Loans, BAL Loans, MAL Loans, DAL Loans, GAL Loans, BEL Loans, Residency Loans and Private Consolidation Loans.   PHEAA covenants and agrees that it will submit, as necessary, such materials (including electronic format versions of the Federal Application or the Federal Consolidation Loan Application) to the U.S. Department of Education (the "Department") for approval.   The parties agree that they will make all changes required by the Department prior to using any such materials.

Section 6.6.   LAI agrees to submit any changes to the materials identified in Section 6.3 and any other promotional or marketing material regarding The Access Group Programs which has the names of the other parties or information regarding the terms

Six-3

of the Loans to the other parties to this Agreement for review and comment.  The other parties agree to review and to provide all comments on such materials (whether by such party or by its counsel) in writing within five Business Days of receipt. Except as provided in Section 6.5, no change shall be made to the materials identified in Section 6.3 nor shall any other promotional or marketing materials containing the names of the other parties or information regarding the terms of the Loans be used in connection with The Access Group Programs without the prior written approval of all of the parties, which approval shall not be unreasonably withheld.  Failure to provide all comments by or on behalf of such party in writing within five Business Days shall be deemed written approval of such materials.  All parties agree to use their best efforts to review and comment on such materials promptly, and to participate in telephone conference calls on which all parties' comments can be obtained.

        The Servicer, each Guarantee Agency, LAI and TERI agree to submit to each other samples of all form letters and notices sent to Eligible Borrowers in connection with the establishment and maintenance of repayment schedules for, and collection of, Loans made under The Access Group Programs, and to consider such changes thereto as another party may reasonably request, provided that the Servicer, the Guarantee Agency or TERI, as the case may be, determines that such changes are not inconsistent with the policies and procedures of the applicable Guarantee Agency or TERI, or with the provisions of the Act, the Fair Debt Collection Practices Act, or other applicable law.  This requirement shall not apply to letters and notices sent after payment of a default claim with respect to a Loan.

        Section 6.7.

        (a)  LAI shall be responsible for assuring that all marketing and promotional activities comply with any applicable federal and state law; provided, however, LAI shall not be responsible to another party to this Agreement for the compliance with any applicable federal and state law of materials final copy for which such party has approved (or has been deemed to have approved). In particular, Society acknowledges that it has directed LAI and the Servicer to include certain information in the exhibits attached hereto to comply with the Truth in Lending Act, the Equal Credit Opportunity Act and other federal, state and local laws, and Society is responsible for the sufficiency of the form of such disclosures. PHEAA and ASA shall be responsible for assuring that all Stafford Loan and Federal Consolidation Loan documentation complies with any applicable federal and state law.

(b) If, notwithstanding the foregoing, any Privately Guaranteed Loan becomes unenforceable because the terms of such Loan, or the forms of the Application or promissory note related thereto, violate any provision of applicable state law or are otherwise insufficient to create a contractual obligation, any loss suffered as a result of such unenforceability will be shared equally by the owner of such Loan and TERI, as more fully described in the Private Guarantee Agreement. In addition, if the terms of any Privately Guaranteed Loan, or the forms of the Application or promissory note related thereto (but not the completion or processing thereof by LAI or the Servicer), are alleged to violate any allegedly applicable state law, and as a result Wilmington Trust or any party hereto is required to pay to or on behalf of any borrower or any state regulatory agency any penalties (including the return of interest, guarantee fees or origination fees, and the payment of court costs and attorneys' fees, but excluding any return of principal payments or the loss of the right to receive future principal or interest payments, and individually and collectively referred to herein as "Penalties") and/or to incur any attorneys' fees, court costs and other defense costs in defending any allegations of such violations ("Costs"), all such Penalties and Costs shall be borne as follows:

(I) The first $1,000 of such Penalties and Costs relating to any occurrence shall be borne by Society.

(II) Thereafter, all such Penalties and Costs shall be borne equally by Society, TERI, and LAI; provided, however, that LAI shall not be required to bear any responsibility for any Penalties or Costs:

(A) that exceed, when aggregated with all other Penalties and Costs with respect to such Annual Program paid by LAI pursuant to this paragraph, the lesser of $1,400,000 or 50% of the fees paid to LAI pursuant to Section 6.9 hereof with respect to such Annual Program;

(B) that are incurred after June 30, 2006 (in the case of Penalties or Costs arising from the 1995-1996 Programs), June 30, 2007 (in the case of Penalties or Costs arising from the 1996-1997 Programs) or June 30, 2008 (in the case

Six-5

of Penalties or Costs arising from the 1997-1998 Programs), as the case may be; or

(C)    to the extent that what would otherwise be LAI's share of such Penalties and Costs that represent attorneys' fees, court costs and/or defense costs exceeds $200,000 relating to any occurrence.

(III)  Any Penalties or Costs that LAI is not required to share in the payment of, due to clause (II) above, shall be borne equally by Society and TERI.

For purposes of this subsection (b):

(i)    an "occurrence" shall include any and all lawsuits, threatened lawsuits and administrative proceedings in any single state (whether or not separated in time), arising out of the same alleged violation or series of violations of the law of such state (regardless of the number of Borrowers, or The Access Group Programs, affected by such alleged violation or series of violations) and applicable to a given Annual Program.

(ii)   a Penalty or Cost which arises from (1) a lawsuit or the settlement of a lawsuit shall be treated as "incurred" on the first date that such lawsuit is filed in a court with appropriate jurisdiction or a counterclaim in such lawsuit is so filed; (2) a threatened lawsuit shall be treated as "incurred" on the date that Society or TERI gives LAI notice of receipt of a written threat of such lawsuit from the prospective plaintiff or plaintiff's counsel, together with a copy of such written threat; or (3) an administrative action shall be treated as "incurred" on the first date that such administrative action is commenced by a state regulatory agency or an authorized representative thereof; which lawsuit, counterclaim, threat of lawsuit or administrative action, as the case may be, affirmatively alleges that the terms of a Privately Guaranteed Loan, or the forms of Applications or promissory note relating thereto, violate applicable state law, notwithstanding that such Penalties and Costs are not assessed or do not become payable until after such date and notwithstanding that such Penalties and Costs may

six-6

not be known or capable of being known as of such date.

(iii)    "Annual Program" refers to the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs, as the case may be, with the effect that the limitations contained in clauses (I) and (II) (A) and (C) apply separately to each such program year.

In furtherance of the preceding paragraph, Society, TERI and LAI each agrees to indemnify the others for the payment of its share of Penalties and Costs as set forth above. Each party to this Agreement that receives notice of any action or threatened action which could give rise to the imposition of any Penalties or Costs shall promptly give notice of such action or threatened action to every other party to this Agreement; _provided_, however, that no failure to give such notice shall relieve Society, TERI or LAI of its obligations with respect to such Penalties and Costs (i) to any party other than the party that failed to give such notice (the "failing party") or (ii) to the failing party unless such failure materially impairs the other parties' ability to defend such action.   Additionally, each party to this Agreement agrees to cooperate in the resolution of legal and administrative proceedings and actions arising in connection with this subsection 6.7(b); provided, however, that such cooperation shall not require the incurrence by a party hereto of costs or payments of a type described in this subsection 6.7(b) in excess of those contemplated in this subsection 6.7(b) for such party.

Section 6.8.    Eligible Institutions will send all Federal Applications, LAL/BAL/GAL Loan Applications, MAL/DAL Loan Applications and BEL Loan Applications to the Designated Address, and Applicants will send all Residency Loan Applications to the Designated Address.  Upon receipt of each Application, LAI will:

(a)   review the Application to ensure that all necessary forms are present and that they have been properly signed and completed;

(b)   use its best efforts to obtain any missing data from the Applicant and/or Eligible Institution;

(c)   send to the Applicant, if necessary, a letter requesting additional information in a form approved by the appropriate Lender;

(d)   use its best efforts to perform edits agreed upon by LAI and the appropriate Guarantee Agency;

(e)    transfer to Society such information from the Application as Society may need to complete the credit review and the Applicant notification procedures described in Sections 4.5 and 4.7 hereof; and

(f)    transfer all information completed by Applicant for a Stafford Loan to the appropriate Guarantee Agency as provided in such Guarantee Agency's dataset layout (upon receipt from Society of notification that such Applicant has been approved by Society pursuant to Section 4.5 or 4.7 hereof if required by the Act).

For Consolidation Loans, LAI will refer inquiries about consolidation to the Servicer for follow-up. The Servicer will process all Consolidation Loan requests in accordance with Article VIII hereof. Neither ASA nor PHEAA shall change its requirements for data transmission under clause (f) without the consent of LAI (which consent shall not be unreasonably withheld).

Section 6.9.    As compensation for the functions described in this Agreement and the Origination and Disbursement Agreement and for the services that are thereby provided to Society, Society agrees to pay directly to LAI such fees as may be agreed upon in writing by LAI and Society. On or before the fifth Business Day of each month, the Servicer shall transmit to LAI in writing or by electronic transfer a report showing the principal amount of Federal Consolidation Loans disbursed by Lender during the preceding calendar month. If LAI notifies the Servicer that such report contains discrepancies from Lender's data, the Servicer and Lender shall provide a reconciliation of such discrepancies to LAI. If LAI provides notice of such discrepancy within fifteen Business Days of receipt of such reports and Lender's data, the Servicer and Lender shall provide such reconciliation within fifteen Business Days of receipt of such notice from LAI.

Section 6.10.    Each party agrees to be solely responsible for the payment of the legal fees and expenses of counsel retained by it in connection with the preparation, execution and delivery of this Agreement and the Related Agreements and the performance of the transactions herein and therein contemplated or any changes thereto proposed from time to time, including, but not limited to, advice regarding the materials identified in Sections 6.3 and 6.6 and advice regarding this Agreement and the Related Agreements, in connection with the participation of each party in the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs. Notwithstanding the preceding sentence:

(i)    LAI and Society mutually agree that each party shall share equally any costs, including legal fees and expenses of counsel, incurred in connection with the cost of developing, reviewing and printing new Applications

resulting from a determination by LAI or Society that such Application should be revised to comply with the laws of certain states as described in Section 12.1 hereof, or that such Applications should be revised for marketing or other programmatic reasons; provided, however, that LAI shall not be required to reimburse Society for any legal fees or expenses of counsel in connection with Society's review of advertising material; and

(ii) LAI, TERI, PHEAA and Society mutually agree that the costs of a single review of state laws applicable to Privately Guaranteed Loans, requested by Society or LAI and similar in scope to the reviews performed on their behalf in the past, shall be shared equally by such parties.

Section 6.11. (A) LAI agrees that it shall not offer, or participate (directly or indirectly) in an arrangement to provide, student loans in competition with the 1995-1996 Programs, the 1996-1997 Programs, or the 1997-1998 Programs (including, without limitation, any student loan program specifically marketed to graduate or professional students or any student loan program for which graduate or professional students are eligible and which is specifically marketed to students at a single school or a group of schools).

(B) If Society or any other bank owned by KeyCorp offers, or participates (directly or indirectly) in an arrangement to provide, student loans in competition with the 1995-1996 Programs, the 1996-1997 Programs, or the 1997-1998 Programs (including, without limitation, any student loan program specifically marketed to graduate or professional students or any student loan program for which graduate or professional students are eligible and which is specifically marketed to students at a single school or a group of schools) which student loans have lower combined fees and interest rates than The Access Group Program(s) with which such loans compete, then, unless Society agrees to reduce the interest rates under The Access Group Program(s) to provide for combined fees and interest rates no higher than such other program (without requiring any reduction of marketing fees paid to LAI), LAI shall have the rights described in this paragraph (B). In such event LAI shall have the right to: (1) agree to reduce its marketing fee by an amount that is equal to one half of the difference between (a) the amount by which the interest rate must be reduced to provide for combined rates and fees no higher than such other program, and (b) 10 basis points, in which event it could require that such interest rates be so reduced; (2) replace Society as Lender, for The Access Group Program(s) with which such other loan program competes, with another lender that qualifies as an "eligible lender" under Section 435 of the Act; or (3) replace Society as Lender, for all of The Access Group Programs, with

another lender that qualifies as an "eligible lender" under Section 435 of the Act. Notwithstanding the foregoing, (i) LAI shall not have the right to require Society to reduce the interest rate pursuant to clause (1) of the foregoing sentence by more than 150 basis points per annum, and (ii) LAI shall not be required to reduce its fees pursuant to said clause (1) by an amount greater than 70 basis points per annum. The right to replace Society could (unless waived in writing by LAI) be exercised, upon five Business Days' notice, at any time while Society (or other KeyCorp bank) continues to participate in such other loan program. For purposes of comparing combined fees and interest rates (and for determining the amount of any marketing fee reduction), all fees shall be converted to an annual percentage assuming an interim period of 18 months, a repayment period of 108 months, and a discount rate equal to the bond-equivalent yield on 91-day U.S. Treasury bills sold at the most recent auction before the date of calculation, plus 3.25%. This paragraph (B) shall not apply to any program in which a bank, that is not currently owned by KeyCorp, participates prior to its acquisition by KeyCorp if the aggregate principal amount of the loans originated under that program does not exceed $10 million for the academic year prior to KeyCorp's acquisition of the bank or any academic year thereafter. LAI acknowledges Key Bank of Maine's participation in the MedAchiever Loan program and Society's participation in the Alternative Dental Education Assistance Loan program and that such programs do not permit LAI the right to replace Society as the lender for The Access Group Programs; provided that none of the terms of such programs are changed to offer better terms. Notwithstanding any such replacement, Society shall have the right and the duty to make Loans (including subsequent disbursements) to all Eligible Borrowers whose Applications have been received at the Designated Address prior to the effective date of such replacement.

(C)    Each Guarantee Agency agrees that it shall provide Society and LAI with 60 days' written notice prior to agreeing to guarantee Federal Family Education Loans under a competing program for which any Eligible Borrowers are eligible for a guarantee fee less than 0.75%. Each Guarantee Agency further agrees to reduce its guarantee fee charged pursuant to Section 7.4 to an amount no greater than the guarantee fee such Guarantee Agency has agreed to charge for such competing program.

(D)    TERI agrees that it shall provide each Lender and LAI with 60 days' written notice prior to agreeing to guarantee student loans under a competing program for which any Eligible Borrowers are eligible, for a total fee equal to less than the total of the guarantee fees and supplemental guarantee fee payable to TERI with respect to any Loan for which such Eligible Borrowers are eligible. Such notice shall identify the program and set forth the total guarantee fees that TERI has agreed to charge. If TERI refuses to reduce its guarantee fee for such Loans (i.e., LAL, BAL, MAL, DAL, GAL, BEL and/or Residency Loans), effective immediately

upon the written request of LAI, to an amount no greater than the guarantee fee TERI has agreed to charge for such competing program then LAI and Society shall have the right, upon five Business Days' notice, to replace TERI with another party willing to provide Private Guarantees. Notwithstanding any such replacement, TERI shall have the right and the duty to provide Private Guarantee for all Loans (including subsequent disbursements) to Eligible Borrowers whose Applications have been received at the Designated Address prior to the effective date of such replacement. For purposes of this Section, any approval by TERI of marketing materials which set forth a guarantee fee shall constitute an agreement by TERI to guarantee loans for such a fee. This paragraph shall not apply to any loan program (a) for which TERI provides guarantees for lower total fees as of the date hereof, or (b) which has materially stricter eligibility requirements (including, by way of illustration but not limitation, a requirement for a co-signer).

TERI agrees that it shall not enter into any agreement with any other party or parties which limits its ability to provide Private Guarantee for LAL, BAL, MAL, DAL, GAL, BEL or Residency Loans or its right to charge such guarantee fees as TERI, Lenders and LAI may agree upon.

[The next page is Seven-1]

ARTICLE VII

STAFFORD LOANS

Section 7.1.  LAI agrees to forward the data from completed Federal Applications for the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs (which, if required by the Act, meet the credit criteria), as described in Section 6.8, for Stafford Loans received at the Designated Address as follows: (1) in the case of Applicants attending Eligible Institutions in Massachusetts, Connecticut, Vermont, New Hampshire, Maine, Rhode Island, Washington, D.C. and New York who either have no outstanding Guaranteed Loans under The Access Group Programs or have one or more outstanding Guaranteed Loans under The Access Group Programs that are Guaranteed by ASA, to ASA; (2) in the case of Applicants who have outstanding Guaranteed Loans under The Access Group Programs, all of which are Guaranteed by ASA, to ASA; and (3) in all other cases, to PHEAA.  Notwithstanding the foregoing, the assignment of responsibilities set forth in this Section 7.1 may be revised as provided in Section 12.21 hereof.

Section 7.2.  Upon receipt of the data for such Applications, each Guarantee Agency will review the data forwarded to it to determine if such Applications meet the program criteria for Stafford Loans set forth in Article IV of this Agreement.  Each Guarantee Agency shall add all data concerning new Applications to its system, process such data, and Guarantee Loans on a daily basis.  Each Guarantee Agency will Guarantee those Loans which meet the program criteria for Stafford Loans set forth in this Agreement.  Each Guarantee Agency will transmit data for rejected, incomplete and approved Applications back to LAI on a daily basis.

Section 7.3.  Society agrees to expedite any required credit approvals for Stafford Loans, and to meet the same standards as set forth in Section 9.3.  ASA and PHEAA each agrees with LAI to expedite the processing of Guarantees for the Stafford Loans and, accordingly, shall (a) use its best efforts to maintain a turn-around time of no more than one Business Day, and (b) in all cases maintain a turn-around time of no more than two Business Days, from the time of receipt of the data for each complete and accurate Federal Application from LAI.  It is acknowledged that PHEAA is currently unable to maintain a turn-around time of one Business Day for Federal Applications involving Unsubsidized Stafford Loans.  If the data with respect to an Application is incomplete or otherwise deficient, ASA and PHEAA each agrees to notify LAI and the Applicant and/or the Eligible Institution, as appropriate, by the next Business Day after receipt of the data for such Application.  If the Application is incomplete or inaccurate, but can be completed or corrected with information within the control of ASA or PHEAA, as the case may be, such Guarantee Agency agrees to use its best efforts to maintain a turn-around time of no more than two Business Days from the time of receipt of the data

Seven-1

for such Application. For purposes of this Section 7.3, processing of a Guarantee shall be deemed completed when notification has been given to the Borrower and LAI of approval or rejection. Each Guarantee Agency agrees to notify LAI by telephone on the next Business Day if the Guarantee Agency misses a regularly scheduled processing cycle or if less than all Loans of a given type are processed in such a cycle.

Section 7.4. Both ASA and PHEAA agree not to charge a guarantee fee for a Loan Guaranteed pursuant to Section 7.2 in excess of three quarters of one percent (0.75%) of the principal amount of the Loan, unless otherwise mandated by the Act.

Section 7.5. If either Guarantee Agency receives an application from an Eligible Borrower for a Stafford Loan for a Loan Period commencing on or after May 1, 1995 and ending on or before June 30, 1998 through such programs as "FASTAP" (outside Massachusetts) or "PALS" (outside Pennsylvania), unless the borrower indicates otherwise, the Guarantee Agency will designate Society as the lender and will send the Application to LAI for processing as described in Section 6.8. The Loan will be treated as if the Borrower's Application had been received by Society for all purposes under this Coordination Agreement.

Section 7.6. Each Guarantee Agency agrees to maintain at all times reserve levels in compliance with Section 428(c)(10) of the Act.

Section 7.7. PHEAA and ASA agree to work together in good faith to resolve any policy or procedural differences in the administration of the Federal Family Education Loan Program, to the end that all Eligible Borrowers and Eligible Institutions will be subject, as nearly as practicable, to the same rules, regulations and procedures without regard to the identity of the Guarantee Agency. At the request of LAI, each Guarantee Agency agrees to submit any such policy or procedural differences to LAI for mediation, and, where practicable, to revise its policies and procedures to the extent necessary to achieve uniformity.

Section 7.8. Each Guarantee Agency agrees to enter into all necessary guarantee agreements with any replacement for Society selected by LAI pursuant to Section 6.11(B) with such Guarantee Agency's consent, which shall not be unreasonably withheld, to provide for the Guarantee of all Stafford Loans and Federal Consolidation Loans on the same terms as such Guarantee Agency's contracts with Society.

[The next page is Eight-1]

## ARTICLE VIII

### CONSOLIDATION LOANS

**Section 8.1.**  LAI shall direct borrower inquiries about federal loan consolidation to the Servicer.  Marketing materials will direct borrowers to contact the Servicer by telephone.  The Servicer shall staff phone lines for prospective Consolidation Loan Applicants from 9 a.m. to 7 p.m., Eastern time.  The Servicer's counselors will complete the Application with information obtained from the borrower and will forward the Application to the borrower for verification and signature.  In the case of Federal Consolidation Loans for which the borrower attended an Eligible School and one of the loans the borrower wishes to consolidate is Guaranteed by ASA, the Servicer will send the potential borrower an application which identifies ASA as the guarantor.  In the case of any other Federal Consolidation Loans, the Servicer will send a potential borrower an application which identifies PHEAA as the guarantor.

The Servicer shall follow the following procedures in directing potential Federal Consolidation Loan borrowers to Society or some other lender under The Access Group Programs:

1)  Each potential borrower will be informed by the Servicer of the lenders (including, where applicable, lenders who have purchased loans made under The Access Group Programs in the secondary market) eligible to finance the loan consolidation and who are participants in The Access Group Programs.

2)  As prescribed by law, the potential borrower shall be given the opportunity to select an eligible lender.

3)  If the potential borrower wants a Federal Consolidation Loan but has no preferred lender, the Servicer shall assign the Federal Consolidation Loan to a lender according to the following criteria:

(a)  the lender must be party to any necessary guarantee agreements with the applicable Guarantee Agency;

(b)  if the potential borrower has no loans to be consolidated which were made under The Access Group Programs, priority shall be given to the then current FFELP lender for The Access Group Programs (e.g., Society for the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs);

(c)  if a lender is not determined under (b), priority shall be given to the lender holding the highest balance of loans to be consolidated; and

(d) if a single lender is not determined under (b) or (c), priority shall be given to the lender holding the borrower's most recently disbursed loan to be consolidated.

For purposes of clause (c) and (d), with respect to Loans held by a trust or other special purpose entity formed in connection with a securitization of Loans, the originator of the trust or other special purpose entity shall be deemed to be the holder of such Loans. The Servicer shall follow the procedures set forth in clauses (3)(c) and (d) above in directing potential Private Consolidation Loan borrowers to Society or some other lender under the Law Access℠ Loan Program.

Section 8.2. For Federal Consolidation Loans, the Servicer will act on Society's behalf to secure and review lender verification certificates to determine for each Consolidated Loan:

(a) that it is a legal, valid, and binding obligation of the borrower,

(b) that each such loan was made and serviced in compliance with applicable laws and regulations, and

(c) for loans under the Act, that the insurance on such loan is in full force and effect.

The verification certificates will also be used to determine the payoff amount for each Consolidated Loan.

Section 8.3. After the Servicer has received the executed Federal Consolidation Loan Application and secured all lender verifications, it shall review the Application and verifications to determine if they satisfy the criteria for a Federal Consolidation Loan set forth in Article IV of this Agreement. PHEAA and ASA will guarantee those Loans which meet the program criteria for Federal Consolidation Loans set forth in this Agreement.

Section 8.4. Federal Consolidation Loan Applications and Private Consolidation Loan Applications will be retained by the Servicer, as provided in Section 10.5.

Section 8.5. The Servicer shall be responsible for disbursing the proceeds of each Federal Consolidation Loan so that each holder of a Consolidated Loan receives all unpaid principal and accrued unpaid interest and late charges due on such loan and for securing and retaining evidence of discharge of each Consolidated Loan.

Section 8.6.    PHEAA and ASA each acknowledge that current law does not allow the Guarantee Agencies to charge the borrower a guarantee fee on Federal Consolidation Loans.

Section 8.7.    The interest rate on Federal Consolidation Loans shall be that set forth in Section 428C(c)(1) of the Act, or such lesser rate determined by Society, with the consent of LAI.

Section 8.8.    Upon receipt of a telephone inquiry regarding a Private Consolidation Loan, the Servicer shall, on behalf of Society:

(a)    obtain the data necessary to make the determinations required by this Section 8.8 from the servicer of the Consolidated Loans;

(b)    verify that each Consolidated Loan is eligible (i.e., that it is a LAL, BEL or Private Consolidation Loan);

(c)    verify that the Consolidated Loans constitute all of the Eligible Borrower's eligible outstanding LAL, BEL and Private Consolidation Loans;

(d)    determine the payoff amount of each Consolidated Loan;

(e)    verify that the aggregate of the payoff amounts of the Consolidated Loans equals or exceeds $7,500; and

(f)    determine whether or not, as of the date of receipt of the completed, signed Application, the Eligible Borrower is current or not more than 45 days delinquent in payment of all amounts due with respect to all of the Eligible Borrower's outstanding LAL, BEL and Private Consolidation Loans.

If the Servicer determines that the Applicant is eligible for a Private Consolidation Loan (without regard to the credit review or to delinquency on the Consolidated Loans) based on clauses (a) through (e) above, it shall transfer to Society such information as Society may need to complete the credit review and notification procedures described in Sections 4.5 and 4.7 hereof, together with the results of the determination described in clause (f) above. Upon receipt from Lender of notification that an Applicant for a Private Consolidation Loan has been approved by Society pursuant to Section 4.5 or 4.7 hereof, the Servicer shall:

(g)    verify that the promissory note has been signed and dated, and that the signature does not appear not to be that of the Eligible Borrower;

Eight-3

(h) calculate the amount of the Private Consolidation Loan, which shall be the sum of the payoff amounts for the Consolidated Loans and the Private Guarantee Fee provided for in Section 9.2 hereof;

(i) check all data provided to it for facial accuracy;

(j) verify that it has received all data necessary for origination of the Loan;

(k) verify that the Applicant has passed the credit check required by Section 4.5; and

(l) if the Applicant was, as of the date of receipt by the Servicer of the Application, more than 45 days delinquent in payment of any amount due with respect to any of the Applicant's outstanding LAL, BEL or Private Consolidation Loans, verify that at some time within 60 days after such receipt the Applicant was current or not more than 45 days delinquent in the payment of all amounts due with respect to all such Loans;

provided that except with regard to clause (i) above, the Servicer will be entitled to rely on the accuracy of data provided to it by another party. If the Servicer is able to make the verifications required of it in clauses (b) through (e), (g), (j), (k) and (l) above, it will approve such Loan and proceed with origination. If it is unable to make any one or more such verifications, it will not originate a Private Consolidation Loan unless and until it is able to resolve the issue(s) noted. TERI will provide Private Guarantee for all Private Consolidation Loans which meet program and credit criteria set forth in this Agreement.

ARTICLE IX

PRIVATELY GUARANTEED LOANS

    Section 9.1.    All LAL/BAL/GAL Loan Applications, MAL/DAL
Loan Applications, BEL Loan Applications and Residency Loan
Applications for the 1995-1996 Programs, the 1996-1997 Programs and
the 1997-1998 Programs will be received at the Designated Address.
LAI agrees to forward to Society the data from completed
Applications, as described in Section 6.8.   Upon receipt of the
data for such Applications, the applicable Lender will review the
data to determine if such Applications meet the credit criteria as
set forth in Article IV of this Agreement and notify LAI as
described in Section 9.3.   LAI shall add all data concerning new
Applications to its system, and process such data, on a daily
basis. Upon its receipt of notification from the applicable Lender
that an Application has passed its credit criteria, LAI, on behalf
of the applicable Lender, will:

    (a)   verify that the school identified in the Application as
          that attended by the Applicant is an Eligible School;

    (b)   verify that the promissory note has been signed and
          dated, and that the signature does not appear not to be
          that of the Eligible Borrower;

    (c)   verify that the Application for such Loan was received by
          LAI (i) in the case of a BEL Loan,  within six months
          before or one month after the Applicant's graduation from
          an Eligible Law School, or (ii) in the case of a
          Residency Loan, during the Applicant's final scheduled
          year of attendance at, or within one month after his/her
          graduation from, an Eligible Medical School, or, in
          either case, that LAI has (with the approval of TERI, if
          required) made the determination described in Section 4.2
          hereof;

    (d)   calculate the amount of such Loan, such amount to be the
          lesser of (i) the Loan amount requested by the Eligible
          Borrower, (ii) (A) in the case of a LAL Loan, a MAL Loan,
          a DAL Loan, a GAL Loan, or a BAL Loan to an Eligible
          Borrower enrolled on at least a half-time basis, the
          Eligible Borrower's unmet educational needs as certified
          by the Eligible School, (B) in the case of a BAL Loan to
          an Eligible Borrower enrolled on a less than half-time
          basis, the Eligible Borrower's tuition and fees plus
          $500, as certified by the Eligible Business School, (C)
          in the case of BEL Loans, the educational expenses
          relating to studying for the bar exam as certified by the
          Applicant and  (D) in case of Residency Loans, the
          educational expenses (including interview and relocation
          costs) relating to securing participation in a required

residency as certified by the Applicant, and (iii) the difference between the maximum principal amount of educational debt set forth in Section 3.5, 3.6, 3.7, 3.8, 3.9, 3.10 or 3.11 as appropriate, and the total outstanding education debt shown by the Applicant on his/her Application;

(e)   verify that the amount of each Loan equals or exceeds $500;

(f)   check all data provided to it for facial accuracy; and

(g)   verify that it has received all data necessary for disbursement of the Loan;

provided that except with regard to clause (f) above, LAI will be entitled to rely on the accuracy of data provided to it. If LAI is able to make the verifications required of it in clauses (a) through (c), (e) and (g) above, it will approve the Private Guarantee of such Loan on behalf of TERI and proceed with disbursement. If it is unable to make any one or more such verifications it will not disburse a Loan to the Applicant unless and until it is able to resolve the issue(s) noted. TERI will provide Private Guarantee for all LAL Loans, BAL Loans, MAL Loans, DAL Loans, GAL Loans, BEL Loans or Residency Loans which meet the program and credit criteria set forth in this Agreement.

Section 9.2. Society and TERI agree that a fee for Private Guarantee equal to 8.0% of the original principal amount of each LAL and DAL Loan, 8.5% of the original principal amount of each BEL Loan, 7.0% of the original principal amount of each GAL Loan and 6.5% of the original principal amount of each BAL, MAL and Residency Loan will be charged to each Eligible Borrower; which shall be deducted from the gross proceeds of each Privately Guaranteed Loan by Lender prior to funding. Society and TERI agree that a fee for Private Guarantee equal to 1% of the aggregate of the payoff amounts for the Consolidated Loans to be retired by each Private Consolidation Loan will be charged to each Eligible Borrower, which shall be included in the principal amount of the Private Consolidation Loan. The Private Guarantee fee shall be remitted by Society to or for the account of TERI, in accordance with the applicable Deposit Agreement, on a weekly basis for Privately Guaranteed Loans disbursed during the preceding week. A supplemental guarantee fee equal to 2% of the original principal balance of each LAL, BAL, MAL, DAL, GAL, BEL and Residency Loan made by Society shall be advanced by Society on behalf of the Eligible Borrower, and added to the principal balance of such Loan, at the time of graduation or other separation (in the case of a MAL Loan) or immediately prior to the time such Loan enters repayment (in the case of any other such Loan) and, in either case, before any interest is capitalized. LAI shall pay an additional fee equal to 1% of the original principal balance of each LAL, BAL, MAL, DAL,

GAL, BEL and Residency Loan made to a borrower who, on the date of the Application (and as reported on the Application) has a total outstanding principal amount of education debt exceeding (a) in the case of a LAL, BAL, DAL or BEL Loan, $100,000; (b) in the case of a MAL or Residency Loan, $135,000; and (c) in the case of a GAL Loan, $80,000. Such supplemental guarantee fee and additional fee shall be distributed on terms agreed to by TERI, Society and LAI.

Section 9.3.    Society agrees with LAI to expedite credit review for Privately Guaranteed Loans and, accordingly, shall (a) use its best efforts to complete its credit review, notify LAI of the results thereof (i.e., approval or denial) and, in the case of denials, notify the Applicant as described in Section 4.7 within one Business Day after receiving complete information from LAI pursuant to Section 6.8, and (b) in all cases complete such review and notification (including for "abnormal" status Applications) within two Business Days of receiving such information. In addition, Society agrees to notify LAI of the results of each appeal pursuant to Section 4.7 within one Business Day of the disposition of such appeal. Society shall promptly notify the Servicer of the results of credit reviews and appeals relating to Private Consolidation Loans and, in the case of denials, notify the Applicant as described in Section 4.7 hereof and Section 2.2(b) of the Origination and Disbursement Agreement. LAI agrees to expedite review and processing of the data for Applications for Privately Guaranteed Loans and, accordingly, shall (a) use its best efforts to maintain a turn-around time of no more than one Business Day for LAL Loans, BAL Loans, MAL Loans, DAL Loans, GAL Loans, BEL Loans and Residency Loans and (b) in all cases maintain a turn-around of no more than two Business Days for LAL Loans, BAL Loans, MAL Loans, DAL Loans, GAL Loans, BEL Loans and Residency Loans, from the receipt of the data for a complete and accurate Application. If the data with respect to an Application is incomplete or otherwise deficient, LAI agrees to notify the Applicant and/or the Eligible Institution, as appropriate, by the next Business Day after receipt of such data. If the Application is incomplete or otherwise deficient, but can be processed with information within the control of LAI, LAI agrees to use its best efforts to maintain a turn-around time of no more than two Business Days from the receipt of data for such Application.

Section 9.4.    LAI will transfer approved Loan data to TERI in the format described in the Origination and Disbursement Agreement within five Business Days of the disbursement date. For Private Consolidation Loans, the Servicer will transmit approved Loan data to TERI at least monthly in a written format.

Nine-3

[The next page is Ten-1]

## ARTICLE X

### ORIGINATING AND SERVICING LOANS

Section 10.1. Within 24 hours after receiving a notice of Guarantee from the Guarantee Agency, LAI shall establish a loan account for Society on its computer system. On behalf of Society, LAI shall either (i) cut a check in the amount of the Loan (less any origination or Guarantee fee described herein) on a Society account, and mail the check to the Eligible Institution attended by the Eligible Borrower or (ii) at the request of the Eligible Institution, electronically transfer funds to the Eligible Institution attended. For Loans Guaranteed by PHEAA, LAI shall also mail a disclosure statement in a form acceptable to PHEAA to the Eligible Borrower. For Loans Guaranteed by ASA, LAI shall also mail a disclosure statement in a form acceptable to ASA to the Eligible Borrower. For Consolidation Loans, the Servicer shall establish a loan account for Society on the Servicer's computer system upon receipt of a properly completed Application and promissory note and all necessary verification certificates (and, in the case of a Private Consolidation Loan, the additional verifications required by Section 8.8 hereof). On behalf of Society, the Servicer shall cut a check or electronically transfer funds to each holder of the Consolidated Loan(s) in the amount of the unpaid principal plus accrued and unpaid interest and late charges due on such loan. The Servicer shall also mail (a) a disclosure statement in the form required by the Department of Education or in a form acceptable to PHEAA or ASA, whichever is appropriate, to the Eligible Borrower of each Federal Consolidation Loan and (b) the Truth-in-Lending disclosure statement completed in accordance with Society's instructions (substantially in the form of Exhibit 5 to the Origination and Disbursement Agreement) to the Eligible Borrower of each Private Consolidation Loan. Upon proper presentment, each Lender shall pay each check drawn on such Lender as described in this Section.

Section 10.2. LAI shall notify Society in an electronic format of the amount to be funded: (a) within one Business Day of disbursements on Guaranteed Loans (other than Federal Consolidation Loans) made by check, and (b) at least one Business Day in advance of disbursements on Guaranteed Loans (other than Federal Consolidation Loans) made by electronic funds transfer; and Society shall make funds available for such disbursements as provided in the Origination and Disbursement Agreement. LAI will ensure that each type of approved Loan is disbursed and sent at least twice-weekly in the case of disbursement by check and at least thrice-weekly in the case of disbursement by electronic funds transfer (or, in either case, less frequently if requested by an Eligible Institution) and on LAI's regular disbursement date closest to the disbursement date suggested on the Application; provided such disbursement date is in accordance with the Act.

Ten-1

Section 10.3. Within 24 hours after approving the Private Guarantee of a Loan on behalf of TERI as provided in Section 9.1, LAI shall establish a loan account for the applicable Lender on its computer system. On behalf of such Lender, LAI shall either (i) cut a check to the Eligible Borrower in the amount of the Loan (less any Private Guarantee fee and origination fee described herein) on a Lender account and mail the check to the Eligible Borrower (in the case of a BEL or Residency Loan) or the Eligible Institution attended by the Eligible Borrower (in the case of a LAL, BAL, MAL, DAL or GAL Loan) or (ii) in the case of an LAL, BAL, MAL, DAL or GAL Loan and at the request of the Eligible Institution, electronically transfer funds to the Eligible Institution attended. LAI shall also mail the Truth-in-Lending disclosure statement completed in accordance with Society's instructions (substantially in the form of Exhibit 3 or Exhibit 4, as appropriate, to the Origination and Disbursement Agreement) to the Eligible Borrower.

Section 10.4. LAI shall notify the applicable Lender in an electronic format of the amount to be funded: (a) within one Business Day of disbursements on Privately Guaranteed Loans made by check, and (b) at least one Business Day in advance of disbursements on Privately Guaranteed Loans made by electronic funds transfer; and each Lender shall make funds available for such disbursements as provided in the Origination and Disbursement Agreement. LAI will ensure that each type of approved Loan is disbursed and sent at least twice-weekly in the case of disbursement by check and at least thrice-weekly in the case of disbursement by electronic funds transfer (or, in either case, less frequently if requested by an Eligible Institution) and on LAI's regular disbursement date closest to the disbursement date suggested on the Application; provided, that the first disbursement of any LAL, BAL, MAL, DAL or GAL Loan shall not be made more than twenty days prior to the first day of the Loan Period to be covered by such Loan.

Section 10.5. Upon the initial disbursement of a Loan, LAI shall forward to the Servicer the Application together with the promissory note and all other related documentation (except that relating to credit approvals, which will be forwarded by the applicable Lender). The Servicer shall service the Loans for the period provided in the Servicing Agreement, or for such longer period as may be agreed to by the Servicer and the owner(s) of the Loans. While servicing the Loans, the Servicer shall maintain custody of paper, microfilm or image (or, in the case of documentation other than Applications, promissory notes and credit reports, electronic format) copies of all documentation including all completed approved Applications, and all credit reports for LAL, BAL, MAL, DAL, GAL, BEL, Residency and Private Consolidation Loan Applications (and, if applicable, Federal Applications), for which Lender approved the credit. LAI shall maintain custody of paper, microfilm or image (or, in the case of documentation other

Ten-2

than Applications and promissory notes, electronic format) copies of all incomplete Applications received by it, all letters sent by LAI to Applicants whose Loans are not ultimately approved informing them that their Applications have been rejected or informing them that their Applications are incomplete and requesting missing information and all completed Applications rejected by Lender or by LAI. As provided in Section 8.4, the Servicer will retain documentation for each Federal Consolidation Loan Application and Private Consolidation Loan Application that it processes and which is not approved. Paper, microfilm or image (or, in the case of documentation other than Applications, promissory notes and credit reports, electronic format) copies of documentation and original promissory notes for each approved Loan shall be retained for such period of time as shall be reasonably agreed upon by the Servicer or LAI, as the case may be, and Society. Documentation for each completed and rejected or incomplete Application shall be retained for such period of time as shall be reasonably agreed upon by LAI or the Servicer, as the case may be, and Society. If Society removes the Servicer under the Servicing Agreement, Society shall cause a successor Servicer to be appointed and to assume in writing all the obligations of the Servicer being replaced under this Agreement and the Related Agreements.

Section 10.6. LAI agrees to comply fully and completely with all federal and state laws in originating the Loans, and the Servicer agrees to comply fully and completely with all applicable federal and state laws in servicing the Loans and in maintaining custody of all documentation including documentation specified herein, including, without limitation, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act and truth-in-lending laws. The Servicer further agrees to service such Loans in full accordance with the guidelines and policies of PHEAA, ASA and TERI, to fully maintain the Guarantee and Private Guarantee on the Loans. PHEAA, ASA and TERI each agree to notify the Servicer of changes in their respective guidelines and policies.

Section 10.7. LAI shall provide Society with reports, starting with the week after the first disbursement and weekly thereafter, by program and within each program by Loan type, showing the number of Applications received, the number approved, the principal amount approved, the number rejected, the number canceled, the number and percentage disbursed, the total principal amount of all disbursements, the numbers and percentages disbursed within the "best efforts" turnaround times provided in Sections 7.3(a) and 9.3(a) and within the turnaround times provided in Sections 7.3(b) and 9.3(b). Each report will provide a weekly and cumulative summary. The Servicer shall provide LAI and Society, no later than the 15th day of each month, with reports showing the amounts of guarantee fees added to outstanding Privately Guaranteed Loans pursuant to Section 9.2 hereof and Section 2(I) of the Loan Purchase Agreement during the preceding month. The Servicer shall

provide LAI and Society with additional information reasonably requested by LAI or Society concerning the Loans, including, but not limited to, information on delinquencies and defaults, average principal balance, and complaints.  The Servicer shall provide LAI and Society with information reasonably requested by LAI or Society concerning Federal Consolidation Loan Applications and Private Consolidation Loan Applications, including the number received, the number and percentage approved, the principal amount approved, the number and percentage rejected, reasons for rejection, the number and percentage disbursed, and the total principal amounts of all disbursements.  Society agrees to cause the Servicer to provide TERI with the reports and information specified to be sent to TERI in the Servicing Agreement.

No later than the fifteenth day of each month, commencing (a) June, 1995 with respect to Loans under the 1995-1996 Programs, (b) June, 1996 with respect to Loans under the 1996-1997 Programs, and (c) June, 1997 with respect to Loans under the 1997-1998 Programs, and for so long as Society shall own Loans, Society shall furnish or cause to be furnished, in an electronic form suitable to LAI, a record of all Loans under the 1995-1996 Programs, a record of all Loans under the 1996-1997 Programs and a record of all Loans under the 1997-1998 Programs (the "Records"), as of the last day of the preceding month.  The Servicer acknowledges its responsibility and ability to furnish the Records as required by this paragraph.  Society shall honor LAI's reasonable request for additional Records, at LAI's expense.  The Records shall be on a loan level, by Loan, and shall include, but need not be limited to, the following data points:

1.  Borrower's social security number.

2.  Borrower's name.

3.  Borrower's address.

4.  Address valid indicator.

5.  Borrower's phone number.

6.  Date of birth.

7.  Last school attended — School code original/current (Dept of Education code)

8.  Graduation date.

9.  Out of school date.

10. Current borrower status and date entering that status — in school or grace; repayment; default; prior default currently in repayment; etc.

Ten-4

11. Lender code — original/current.

12. Sequence number.

13. Guarantor/Insurer.

14. Loan OE school code.

15. Grade — year borrower in school.

16. Loan type.

17. Loan period dates — begin and end.

18. Status of loan.

19. Date record created.

20. Interest rate and type (fixed, variable, etc.).

21. Current interest rate type.

22. Total principal amount disbursed.

23. Date of first disbursement and total amount of entire loan.

24. Amount and date of last capitalization and total amount of capitalization.

25. Number of months in grace.

26. Amount and date entering repayment (including capitalized fees and interest, if any) after graduation withdrawal.

27. Principal/interest balance.

28. First payment due date.

29. Amount and date of last payment (principal and interest).

30. Forbearance — date begin/end, amount, reason.

31. Deferment — date begin/end, amount, reason.

32. Days delinquent.

33. Expected pay off date.

34. Closed account — defaulted/written off; paid-in-full; consolidated; other.

35. Date loan purchased, loan principal at purchase, loan status at purchase.

36. Date loan converted.

37. Zero balance reason code, zero balance reason description, zero balance date.

38. Default indicator.

39. Reason for default.

40. Claim amount.

41. Date claim submitted.

42. Date claim paid.

43. Claim payment amount.

44. Date of cure (previous default).

45. Principal/interest balance (cured loan).

The Records shall be provided at Society's expense. Any subsequent purchaser of Loans (other than pursuant to the Loan Purchase Agreement) shall be responsible for furnishing or causing to be furnished, from the point at which the Loans are transferred to the point at which such subsequent purchaser no longer owns the Loans, the continued compilation of the data appearing on the Record, and the continued distribution of the Record to LAI.

Section 10.8. Society shall provide LAI at least monthly with a credit analysis of the Applications, on a time schedule and in a format reasonably satisfactory to the parties, showing, at a minimum, a cumulative listing of Applications received, Applications approved under Section 4.5(a) and Applications rejected, and a compilation of the information in the credit checks made by Society. Notwithstanding the foregoing, for Applications to which the credit criteria set forth in Section 4.5(a)(ii) apply, Society shall provide LAI with a weekly summary report detailing the number of Applications for which credit reports were obtained, the number approved and the number denied, broken down by reason for denial. In the case of denials based upon delinquencies or upon the number of inquiries, the report shall specifically state those which would have been approved under the criteria set forth in Section 4.5(a)(i).

Ten-6

Section 10.9. The Servicer shall maintain a disaster recovery plan and provide access to its source codes in a manner agreed upon by the Servicer and Society pursuant to the terms of the applicable Servicing Agreement.

Section 10.10. LAI and the Servicer shall provide electronic interface with each Lender which will allow each Lender to update its general accounting ledger.

Section 10.11. The Servicer, LAI, ASA and Society each agree to maintain and staff toll-free telephone lines sufficient to respond to (and in the case of LAI and the Servicer, to meet the performance standards set forth in Section 10.12 in responding to) inquiries from Applicants, Eligible Borrowers and financial aid advisors, and to cooperate in the dissemination of the telephone numbers for such lines.

Section 10.12. LAI and the Servicer shall meet the following standards (on the basis of a weekly average of daily results) with respect to telephone and mail correspondence received from Applicants and Eligible Borrowers:

(A)  for the period from the commencement of the 1995-1996 Programs through June 30, 1996:

(i) 80% of phone calls answered within one minute of the commencement of ringing;

(ii) an average of no more than 2 minutes on hold after the call is answered before receiving assistance;

(iii) a maximum of 5 minutes on hold after the call is answered before receiving assistance;

(iv) callers shall not receive busy signals on more than 10% of all calls; and

(v) 90% of all phone or mail inquiries requiring a written response shall be responded to by mail within 10 Business Days of receipt.

(B)  LAI, Society and the Servicer agree to review the standards set forth in paragraph (A) before or on July 1, 1996. Based on that review LAI, Society and the Servicer agree to negotiate in good faith for the improvement of such standards, and to consider the following standards:

(i) 95% of phone calls answered within fifteen seconds of the commencement of ringing;

(ii) an average of no more than 1 minute on hold after the call is answered before receiving assistance;

(iii) a maximum of 2 minutes on hold after the call is answered before receiving assistance;

(iv) callers shall not receive busy signals on more than 5% of all calls; and

(v) 95% of all phone or mail inquiries requiring a written response shall be responded to by mail within 5 Business Days of receipt.

Upon mutual agreement of LAI, Society and the Servicer revised servicing standards will be agreed upon for program years 1996-1997 and 1997-1998.

Ten-8

[The next page is Eleven-1]

ARTICLE XI

TERM

Section 11.1. This Agreement shall be effective on the date first above written. It shall apply only to the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs.

Section 11.2. (A) If any party notifies any other party in writing, with written copies to all additional parties, that such other party has breached the terms of this Agreement or any Related Agreement, which breach materially and adversely impacts one or more of The Access Group Programs, and the value of the Loans, and such other party fails to cure the breach within five Business Days of the date of the notice, the obligations of the parties to this Agreement to such breaching party shall terminate effective five Business Days from the date of the notice. For purposes of this clause (A) only, a breach shall be deemed to materially and adversely impact one or more of The Access Group Programs and the value of the Loans only if the damages for such breach exceed $1,000,000.

(B) If any party notifies any other party in writing, with written copies to all additional parties, that such other party has otherwise materially breached the terms of this Agreement or any Related Agreement, and such other party fails to cure the breach within 30 days of the date of the notice, the obligations of the parties to this Agreement to such breaching party shall terminate effective 30 days from the date of the notice.

(C) Notwithstanding the foregoing, if any Guarantee Agency or TERI fails to maintain reserves as required by this Agreement or any Related Agreement, and if LAI has received, for each of the three most recent reporting periods, either (i) quarterly reports of such Guarantee Agency's or monthly reports of TERI's (as the case may be) reserve levels, or (ii) notice from Society that such Guarantee Agency or TERI (as the case may be) has not provided such reports as agreed, then Society may, at its option, cease originating Loans immediately without any cure period upon notification to all parties not later than 12:00 Eastern time on the date Society ceases originations; provided however, that (x) Society shall continue to originate and disburse any Loan to an Eligible Borrower who has been notified that his/her Loan has been approved, and (y) Society shall make all subsequent disbursements on Loans for which the first disbursement has previously been made.

(D) Upon the occurrence of any of the following events with respect to a party hereunder (the "Affected Party"), the obligations of the other parties hereunder to the Affected Party shall terminate immediately: the Affected Party generally discontinues business, or the Affected Party makes an assignment

for the benefit of creditors, files a petition in bankruptcy, is unable generally to pay its debts as they come due, is adjudicated insolvent or bankrupt or there is entered any order or decree granting relief in any involuntary case commenced against the Affected Party under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or if the Affected Party petitions or applies to any tribunal for any receiver, trustee, liquidator, assignee, custodian or sequestrator or institutes any other similar procedure under the law or statutes of any jurisdiction, whether now or hereafter in effect, or if there is commenced against the Affected Party any such proceeding in a court of law which remains undismissed or shall not be discharged, vacated or stayed, or such jurisdiction shall not be relinquished, within 30 days after commencement, or the Affected Party by any act indicates its consent to, approval of, or acquiescence in any such proceeding in a court of law, or to an order for relief in an involuntary case commenced against the Affected Party under any such law, or to the appointment of any other similar official for the Affected Party or a substantial part of its properties, or if the Affected Party suffers any such receivership, trusteeship, liquidation, assignment, custodianship, sequestration, reorganization or other similar procedure to continue undischarged for a period of 30 days after commencement or if the Affected Party takes any action for the purposes of effecting the foregoing.

(E) The nonbreaching parties and the parties that are not an Affected Party agree to cooperate and use their best efforts to continue to work with LAI in ensuring the continuation of the 1995-1996 Programs, the 1996-1997 Programs and/or the 1997-1998 Programs without undue interruption.

<u>Section 11.3</u>. Unless previously terminated, this Agreement shall apply to all Loans to be financed under the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs and shall remain in full force and effect until all such Loans financed hereunder have been retired.

<u>Section 11.4</u>. If this Agreement is terminated for any reason, the parties shall cooperate in an orderly cessation of their rights and responsibilities under this Agreement and in the return to each party of the records, data processing records, reports, documents and correspondence, if any, owned by that party.

[The next page is Twelve-1]

## ARTICLE XII

### GENERAL PROVISIONS

**Section 12.1.**  Each party hereto agrees that it will use its best efforts to ensure the success of the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs.  The parties will meet as necessary to develop solutions to assure that the time frames stated in the Agreement are met.  If, as the result of any court decision, law or regulation (whether currently in effect or hereafter decided, enacted or promulgated), Society reasonably believes that the continued assessment of the interest rate, fees and charges it contemplates assessing on Privately Guaranteed Loans or the continued use of any other provision of the Application would violate any applicable law, then Society shall notify the other parties in writing of the decision, law or regulation and shall present to them a plan to minimize or eliminate the adverse impact resulting therefrom.  All other parties agree to consider the plan, including such changes in pricing as Society may propose, promptly and in good faith, and to use their best efforts to cooperate with Society in implementing any agreed-upon course of action.  In no event shall any party be required to take any action contrary to law.

**Section 12.2.**  This Agreement may not be assigned or delegated by any party without the written consent of all other parties hereto, which consent will not be unreasonably withheld. Notwithstanding the foregoing, (a) Society may assign to a purchaser of Loans such of its rights hereunder as relate to Loans sold to such purchaser, provided that such purchaser must (except in the case of the purchase of a defaulted Loan by TERI, LAI or a Servicer) assume in writing Society's obligations under Sections 9.2, 10.7, 12.2, 12.3, 12.6, 12.7 and 12.9 of this Coordination Agreement with respect to such Loans; and (b) such of the rights and obligations of the Servicer hereunder as relate to Loans which are serviced by a successor Servicer shall be assigned to the successor Servicer selected in accordance with the provisions hereof, provided that such successor Servicer assumes all such obligations in writing. The Servicer hereby agrees to execute such documents as may be necessary to evidence said assignment to a successor Servicer.

**Section 12.3.**  Subject to compliance with the next paragraph, Society may sell the Stafford and Federal Consolidation Loans, in whole or in part, to any person eligible to be a holder of Guaranteed Loans under the Act, and may sell its Privately Guaranteed Loans, in whole or in part, to any person; provided, however, that all Loans of a single Eligible Borrower held by Society shall be sold to the same purchaser if any of such Eligible Borrower's Loans are to be sold.  Notwithstanding the foregoing, Society may pledge less than all Loans of a single Eligible Borrower to secure a borrowing by Society if only one type of Loan

(*i.e.*, Guaranteed or Privately Guaranteed) is pledged, so long as all Loans of that type of such Eligible Borrower are pledged.

In connection with any contemplated sale by Society of Loans (except pursuant to a securitization of the Loans pursuant to which Society will retain administrative responsibilities), Society shall give the other parties hereto 30 days prior notice of the proposed solicitation of bids. Either or all of LAI, TERI and PHEAA may submit bids to Society. If (a) no other bid exceeds PHEAA's bid, Society shall sell the Loans proposed to be sold to PHEAA; or if (b) no other bid exceeds LAI's bid, and LAI's bid exceeds PHEAA's bid, Society shall sell the Loans to LAI; or if (c) no other bid exceeds TERI's bid and TERI's bid exceeds PHEAA's and LAI's bids, Society shall sell the Loans to TERI, unless (d) in any case, Society elects in writing not to sell the Loans to any person. Notwithstanding the foregoing, in connection with any contemplated sale of Loans by Society on a servicing-released basis (*i.e.*, where PHEAA will not retain servicing of the Loans being sold), Society shall give PHEAA 30 days' prior notice of the proposed date of sale, including the identity of the purchaser and the sales price, and PHEAA shall have the opportunity within 20 days following the date of such notice to offer to purchase, on or before the fifth day prior to the proposed sale date, such Loans for a price equal to or greater than the sales price set forth in such notice. Society shall sell the Loans proposed to be sold to PHEAA, if PHEAA submits such offer to purchase, unless Society elects in writing not to sell the Loans to any person. For purposes of this paragraph only, the term "TERI" shall refer to The Education Resources Institute, Inc. or any of its then current affiliates.

The other parties hereto each shall cooperate with Society in the sale of any Loans held by Society. Any future purchaser (and any secured party that forecloses on its security interest) of Loans made under the 1995-1996 Programs, the 1996-1997 Programs or the 1997-1998 Programs must, as a condition precedent to such purchase, assume in writing all of Society's obligations under Sections 10.7, 12.2, 12.3, 12.6, 12.7 and 12.9 of this Coordination Agreement with respect to such Loans. Any agreement pursuant to which loans are sold, pledged or otherwise transferred shall so state.

Section 12.4. Each party with respect to itself represents and warrants that the making and performance of this Agreement and the activities contemplated hereby have been duly authorized by all necessary corporate action, and do not and will not:

(a) violate any provision of law (except as otherwise described in Section 6.7 hereof with respect to the Applications), or any regulation, order, decree, writ

or injunction, or any provision of its charter or bylaws; or

(b) violate or result in the breach of, or constitute a default or require any consent under, any agreement or instrument by which it or any of its property may be bound or affected;

and that this Agreement is the legal, valid and binding obligation of such party, enforceable in accordance with the terms hereof subject to the exercise of judicial discretion in accordance with general principles of equity, to the exercise of the police powers of the several states of the United States of America and of the constitutional powers of the United States of America and to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally. Each party with respect to itself further represents and warrants that there is no pending or threatened litigation that would materially affect that party's ability to perform its obligations hereunder.

Section 12.5. This Agreement shall be construed in accordance with and be governed by the laws of the Commonwealth of Pennsylvania. Notwithstanding the foregoing, the promissory notes evidencing LAL, BAL, GAL, BEL, Residency and Private Consolidation Loans, and MAL and DAL Loans made under the 1996-1997 Programs and the 1997-1998 Programs, shall be construed in accordance with and be governed by federal laws and the laws of the State of Ohio without regard to conflict of laws rules; the promissory notes evidencing MAL, DAL Loans made under the 1995-1996 Programs shall be construed in accordance with and be governed by federal laws and the laws of the State of Delaware without regard to conflict of laws rules; the Private Guarantee Agreement and the ASA Remote Time-Sharing Services Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts without regard to conflict of laws rules; and the Deposit Agreements and the Security Agreements shall be construed in accordance with and governed by federal laws and the laws of the State of Ohio without regard to conflict of laws rules. In any action or proceeding arising out of or relating to this Agreement and brought by any parties hereto or their successors or permitted assigns, the parties hereby submit to the jurisdiction of any state or federal court sitting in the State of Delaware, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such state or federal court. It is not the intention of this provision to provide for exclusive jurisdiction in the State of Delaware or to contradict provisions of Related Agreements submitting to jurisdiction in other states.

Section 12.6. (a) Each party agrees to cooperate with each of the other parties, and with their internal or external auditors (which shall include auditors for any creditor of Society

to which the Loans have been pledged as collateral; provided that such creditor has agreed in writing not to use any information obtained in connection with any such examination or audit except for the limited purpose of protecting the value of its collateral), or governmental examiners, at such other party's expense, and to provide any information regarding origination, disbursement, servicing, and data collection as reasonably requested by the other parties, their auditors, or governmental examiners as necessary or desirable for the performance of an audit or examination. Each party shall make available any necessary supporting records to each other party and shall resolve any discrepancy claimed to exist in such records to the reasonable satisfaction of the other party within 30 days of the date that other party has claimed that a discrepancy exists. Failure to resolve such discrepancy shall be grounds for termination for cause. Notwithstanding the foregoing, the parties acknowledge that audit reviews conducted during heavy processing periods may disrupt such operations. Accordingly, unless a party has reason to believe that another party is in material breach of the performance of its obligations under this Agreement or the Related Agreements, reviews by internal or external auditors shall only be scheduled during the months of April, May, June, September, October, November or December.

(b)    LAI shall retain KPMG Peat Marwick, or such other firm of certified public accountants as may be acceptable to all of the parties, to conduct an annual review of the parties' performance of their respective duties (including those relating to Consolidation Loans) under The Access Group Programs (including under the Related Agreements) for each program year covered by this Agreement. All parties agree to cooperate in the performance of such review. Such cooperation shall include, but not be limited to, allowing site visits, making available personnel for interviews and providing the information referred to in clause (a) above. The parties agree to share the costs of such reviews (after deducting amounts agreed to be paid by others who are not party to this Coordination Agreement) as follows: LAI, 25%; Society, 25%; PHEAA, 20%; TERI, 20%; and ASA, 10%.

(c)    All parties agree to cooperate in establishing quarterly meeting dates, during the second month of each calendar quarter, at which representatives from each party will be available to discuss the status of The Access Group Programs and any issues that may have arisen hereunder, including the parties' performance of their respective duties hereunder and under the Related Agreements.

Section 12.7.    The obligations under this Agreement of each of the parties are several and distinct, each party being responsible solely for its own performance pursuant to the terms and conditions of this Agreement. Each party agrees to pay for any loss, liability or expense, including reasonable attorney's fees resulting from, or attributable to, any breach by that party of its

obligations arising under this Agreement where the final determination of liability on the part of such party is established by an arbitrator to which such party has agreed to submit, by a court of law with appropriate jurisdiction or by way of settlement agreed to by such party. This shall not be construed to limit any party's rights, obligations, liabilities, claims or defenses which arise as a matter of law or pursuant to any other provision of this Agreement.

Section 12.8. In recognition of the marketing and development responsibilities of LAI in connection with The Access Group Programs, the parties agree that LAI shall retain all ownership of, and the sole and exclusive use of, all copyrightable materials and publications developed by LAI (and by its predecessors, Law School Admission Council, Inc. and Law School Admission Services, Inc.) prior to and pursuant to this Agreement including the names "Law Access℠," "Business Access℠," "Medical Access℠," "Dental Access℠," "Graduate Access℠" and "The Access Group℠" or any other name designated by LAI, and all trademarks and service marks used or developed by LAI (and by such predecessors) in connection herewith.

Section 12.9. In the course of performing its obligations under this Agreement, each party may receive valuable information from another party or parties. Such information shall be designated as confidential and shall be kept confidential as of the date so designated by the party. The parties acknowledge the designation of this Coordination Agreement and the Related Agreements (other than the ASA Federal Guarantee Agreement, the ASA Certificate of Comprehensive Insurance, the PHEAA Consolidation Loan Guarantee Agreement and the PHEAA Federal Guarantee Agreement) as confidential. Each party to this Agreement agrees to maintain the confidentiality of all such data, materials and information entrusted to it by any other party and agrees not to use such data, materials and information for any purpose other than the limited purpose of performing its obligations under this Agreement. The foregoing shall not prohibit Society from showing Sections 10.7, 12.2, 12.3, 12.6, 12.7 and 12.9 of this Coordination Agreement to prospective purchasers or pledgees of Loans. This section shall not apply (a) to information LAI receives from or provides to Society or the Servicer either providing a credit analysis of the Applications or providing other information on the student loan portfolio, as set forth in Sections 10.7 and 10.8 or (b) with respect to any party, to information which has become generally available in the public domain through no fault of such party. This section shall not prevent the disclosure of such data, materials and information to a party's attorneys, auditors and other consultants who are bound to maintain the confidentiality of such data, materials and information. In the event any party becomes legally compelled to disclose any confidential data, materials or information (including to the Department of Education), such party will provide the other parties with prompt

notice of such requirement so that such parties may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this agreement. In the event a protective order or other remedy is not obtained, or compliance is waived, each party agrees that there will be furnished to the authorities compelling disclosure only such portion of the confidential data, materials or information as such party's counsel shall advise in writing must be disclosed. Prior to such disclosure, all parties shall consult and use all reasonable efforts to agree on the nature, form, timing and content of such disclosure.

Section 12.10. Each party shall promptly notify all other parties of (i) any pending or threatened dispute, arbitration, litigation, or administrative procedure involving such party, regardless of whether initiated by or against such party, which would adversely affect one or more of The Access Group Programs or would materially impair the ability of that party to perform its obligations under this Agreement or any Related Agreement, and (ii) any merger or acquisition of such party.

Section 12.11. All notices under this Agreement (except telephonic notices pursuant to Section 7.3 and 9.3, which shall be directed to (302) 477-4117 or (302) 477-4115) shall be in writing and shall be sent by any means requiring receipt signature, or by facsimile confirmed by first-class mail, postage or other delivery charge prepaid to:

LAI:      Daniel R. Lau, President
          Law Access, Inc.
          1411 Foulk Road
          P.O. Box 7430
          Wilmington, DE 19803-0430

Society:  Randall M. Behm, Senior Vice President
          Society National Bank
          5000 Tiedeman Road
          Brooklyn, OH 44144-2340

ASA:      Sara A. Stott, President
          American Student Assistance Guarantor
          330 Stuart Street
          Boston, MA 02116

PHEAA:    Michael H. Hershock, President and CEO
          Pennsylvania Higher Education
          Assistance Agency
          1200 North 7th Street
          Harrisburg, PA 17102

Twelve-6

TERI:      Ernest T. Freeman, President
                The Education Resources Institute, Inc.
                330 Stuart Street, Suite 500
                Boston, MA 02116-5237

Wilmington Trust:    Eric Chung
                Wilmington Trust Company
                Rodney Square North
                1100 North Market Street
                Wilmington, DE 19890-0001

Any party may, by notice to each other party, designate a different address for notices hereunder.

**Section 12.12.** This Agreement, the Related Agreements and any other agreements contemplated herein or therein constitute the exclusive agreement of the parties relating to the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs and supersede any other oral or written communications, agreements or understandings between or among them relating in any way to the 1995-1996 Programs, the 1996-1997 Programs and/or the 1997-1998 Programs. In the event of conflicts between this Agreement and the Related Agreements, this Agreement shall govern. This Agreement may be amended only by a written agreement signed by all the parties, except (i) as otherwise provided in Sections 4.5(c), 12.17, 12.21 and 12.24, (ii) that Exhibit V may be amended by the written agreement of LAI, Society and TERI, and (iii) that any one of the Related Agreements may be amended by a written agreement signed only by the parties to the Related Agreement being amended; provided each party to this Agreement shall be given a copy of any proposed amendment to a Related Agreement 15 days before it becomes effective.

**Section 12.13.** This Agreement may be simultaneously executed in several counterparts each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 12.14.** If any provision of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect or impair the validity or enforceability of the remaining provisions of this Agreement, which shall remain in full force and effect, and the parties hereto shall continue to be bound thereby.

**Section 12.15.** All representations and warranties of the parties contained in this Agreement shall survive delivery of this Agreement and the transactions contemplated hereby, and termination of this Agreement.

**Section 12.16.** This Agreement is for the sole and exclusive benefit of the parties hereto and shall not be construed to confer any benefit or right upon any other parties.

**Section 12.17**. The other parties to this Agreement agree to provide LAI with access to a toll-free telephone number through AT&T, unless otherwise agreed by LAI.

**Section 12.18**. In the event that changes to the Act render any provisions hereof unenforceable or impossible to perform, the parties agree to negotiate in good faith to replace such provisions with provisions having, as nearly as possible, the same economic impact on the parties as those provisions rendered unenforceable or impossible to perform. The parties further acknowledge that changes to the Act that do not conflict with the provisions hereof will become part of the terms hereof.

**Section 12.19**. The parties hereto acknowledge that Society's corporate parent is considering a restructuring that may result in the creation of a separate national bank to handle nation-wide consumer credit programs, including The Access Group Programs. The other parties hereto agree not to unreasonably withhold their consent to the assignment by Society (and Society National Bank, Indiana) of the Loans and of their rights hereunder and under the Related Agreements to such a national bank, the assumption by such a national bank of all of Society's (and Society National Bank, Indiana's) duties with respect hereto and to the Related Agreements, and the release of Society (and Society National Bank, Indiana) from all such duties.

**Section 12.20**. Society agrees to cooperate with any other lenders participating in the 1998-1999 and 1999-2000 The Access Group Programs in the exchange of Privately Guaranteed Loans and of Guaranteed Loans made to borrowers who also obtained such types of loans from such lenders, for approximately equal principal amounts of privately guaranteed loans and guaranteed loans obtained from such lenders by Eligible Borrowers who also obtained such types of loans from Society hereunder (to the end that a borrower's loans of each type will, to the extent practicable, all be held by a single lender). LAI agrees that it will not enter into future program agreements for those years with lenders who have not agreed so to cooperate with Society.

**Section 12.21**. (A) Society and LAI shall have the right, upon five Business Days' written notice, to reassign one or more states from one Guarantee Agency to the other or from a Guarantee Agency or the Servicer, as the case may be, to a third party, as provided in this Section 12.21. Any such reassignment shall be effective with respect to Applications received at the Designated Address on or after the fifth Business Day following such notice. States may be reassigned from one Guarantee Agency to the other

Guarantee Agency, or from a Guarantee Agency or the Servicer to a guarantee agency or servicer not then a party to this Agreement if the Guarantee Agency or Servicer has failed to meet one or more of the following standards:

(i)   each Guarantee Agency and the Servicer shall comply in all material respects with their respective obligations under this Coordination Agreement and the Related Agreements;

(ii)   each Guarantee Agency shall meet the "best efforts" turnaround times set forth in Section 7.3(a) with respect to at least 95% of the Loans processed each month;

(iii)   each Guarantee Agency shall meet the turnaround times set forth in Section 7.3(b) in all cases except where exceptional circumstances beyond the Guarantee Agency's control have prevented such compliance and where the Guarantee Agency has taken steps reasonably satisfactory to LAI and Society to address such circumstances;

(iv)   each Guarantee Agency shall add all data concerning new Applications for all programs and Loan types to its system, and process such data, on a daily basis;

(v)   each Guarantee Agency shall provide availability of remote access (pursuant to the Remote Time-Sharing Services Agreements) on at least the same basis as is being provided as of the date of this Agreement.

(vi) each Guarantee Agency will promptly implement such policy and procedural changes as may be necessary to conform to program standards established by LAI pursuant to Section 7.7.

(vii) PHEAA shall have the capability (a) no later than May 1, 1995 to accept, and transfer to its servicing system for servicing, electronic files relating to Loans originated by another party (including, but not limited to, LAI), (b) no later than May 1, 1995 to combine multiple loans for an individual borrower on a single statement, and (c) no later than July 1, 1995 to charge and account for late charges for borrowers whose payments are late.   PHEAA shall commence testing each such capability no later than March 1, 1995 in the case of (a) and (b) above, and June 1, 1995 in the case of (c) above.

(viii) no later than July 1, 1996, PHEAA shall have the capability to implement programs for reduced interest rates on Guaranteed Loans as described in Section 3.2 hereof.

(ix) The Servicer shall meet the standards set forth in Section 10.12 hereof with respect to telephone and mail correspondence.

(B) LAI shall have the right, upon five Business Days' written notice to the Guarantee Agency, to reassign any Eligible School from one Guarantee Agency to another Guarantee Agency, at the request of such Eligible School. Any such reassignment shall be effective with respect to Applications received at the Designated Address on or after the fifth Business Day following such notice.

(C) No state or Eligible School shall be reassigned to a different Guarantee Agency without the consent of the Guarantee Agency to which the state or Eligible School is to be reassigned. No state for which a Guarantee Agency has been designated as the primary guarantor by the U.S. Department of Education shall be reassigned from that Guarantee Agency unless all other states assigned to such Guarantee Agency have been reassigned.

Section 12.22.

(A) All parties agree to negotiate in good faith for the development of one or more additional programs for the provision of loans to graduate and professional students at the request of LAI, giving due consideration to lead time required for implementing such a program.

(B) All parties agree to negotiate in good faith for the development and implementation of such forms and procedures as may be necessary to provide for the automatic consolidation of all prior loans under a given The Access Group Program upon the disbursement of a new Loan under such program.

(C) The affected parties agree to negotiate in good faith for the amendment of the Deposit Agreements and Security Agreements to simplify the arrangements under which the funds subject to those agreements may be applied for the payment of claims relating to loans made in different program years.

(D) Society, LAI and PHEAA agree to work in good faith with other holders of loans under prior years' Law Access℠ Loan Programs toward the standardization of policies and procedures that affect the Servicer's operations.

Section 12.23. Each party hereto acknowledges its policy not to discriminate on the basis of age, race, gender, marital status, religion, color, handicap, physical condition, sexual orientation, national origin, receipt of income from public assistance programs or good faith exercise of rights under the Consumer Credit Protection Act in employment (including recruiting, training, promoting, demoting, layoff or other termination, and compensation) or in any dealings whatsoever with Applicants, Eligible Borrowers or representatives of Eligible Institutions.

Section 12.24. In the operation of the 1995-1996 Programs, the 1996-1997 Programs and the 1997-1998 Programs, the parties agree to comply with and be bound by the policies attached hereto as Exhibit Y, as such policies may be amended from time to time. Any such policy may be amended by the parties that have adopted such policy, without the consent of the other parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

LAW ACCESS, INC.

By: _Daniel R. Lau_
Daniel R. Lau
Its President


THE EDUCATION RESOURCES INSTITUTE, INC.


By: _____
Ernest T. Freeman
Its President


SOCIETY NATIONAL BANK

By: _____
Randall M. Behm
Its Senior Vice President


Twelve-11

MASSACHUSETTS HIGHER EDUCATION
   ASSISTANCE CORPORATION, d/b/a American
   Student Assistance Guarantor

By: _____
    Sara A. Stott
    Its President

PENNSYLVANIA HIGHER EDUCATION
   ASSISTANCE AGENCY

By: _____
    Michael H. Hershock
    Its President and CEO

Approved as to form and
legality this 23rd day of
March , 1995.

_____
PHEAA Legal Counsel

Approved as to form and
legality this ____ day of
_____, 1995.

_____
Deputy Attorney General

Twelve-12

## EXHIBITS

A.    LAL/BAL/GAL Loan Application with Promissory Note

B.    MAL/DAL Loan Application with Promissory Note

C.    Draft of BEL Application with Promissory Note

D.    Draft of Residency Loan Application with Promissory Note

E.    Private Consolidation Loan Application/Note

F.    Form of Electronic Format LAL/BAL/GAL Loan Application, together with certification and Promissory Note

G.    Origination and Disbursement Agreement

H.    ASA Federal Guarantee Agreement

I.    ASA Certificate of Comprehensive Insurance

J.    PHEAA Federal Guarantee Agreement

K.    PHEAA Consolidation Loan Guarantee Agreement

L.    ASA/LAI Remote Time-Sharing Services Agreement

M.    PHEAA/Society Remote Time-Sharing Services Agreement

N.    PHEAA/LAI Remote Time-Sharing Services Agreement

O.    Private Guarantee Agreement

P.    Servicing Agreement

Q.    Loan Purchase Agreement

R.    Form of Electronic Application User Agreement

S.    Loan Terms

T.    Federal Consolidation Loan Brochure

U.    Consumer Information Booklets

V.    List of non-AACSB-accredited Eligible Business Schools

W.    The Access Group logo

X.    Standard Forms

Y.    Policies

Z.    Remote Origination Services Agreement

31



**THE**

# access

## GROUP.SM

EDUCATION

FINANCING &

SERVICES

# EXHIBIT B

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 2,680,791

Registered Jan. 28, 2003

## SERVICE MARK
### PRINCIPAL REGISTER

## COMPREHENSIVE ACCESS

ACCESS GROUP, INC. (DELAWARE CORPORA-
TION)
1411 FOULK ROAD
P.O. BOX 7430
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATIONAL
LOAN PROGRAMS AND SERVICES FOR STU-
DENTS; PROVISION OF FINANCIAL AID INFOR-
MATION ABOUT RELATED PRODUCTS AND
SERVICES TO STUDENTS AND TO FINANCIAL
AID ADMINISTRATORS AND OTHER PROFES-
SIONALS IN THE HIGHER EDUCATION COMMU-
NITY, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-19-2002; IN COMMERCE 2-19-2002.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "COMPREHENSIVE", APART
FROM THE MARK AS SHOWN.

SER. NO. 76-396,377, FILED 4-18-2002.

SUSAN STIGLITZ, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

Reg. No. 2,226,409

## United States Patent and Trademark Office

Registered Feb. 23, 1999

## SERVICE MARK
### PRINCIPAL REGISTER

## HEALTH ACCESS

ACCESS GROUP, INC. (DELAWARE CORPORATION)
1411 FOULK ROAD
WILMINGTON, DE 19803 BY CHANGE OF NAME FROM LAW ACCESS, INC. (DELAWARE CORPORATION) WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATIONAL LOAN PROGRAMS AND SERVICES FOR STUDENTS IN THE HEALTH CARE FIELD; PROVISION OF FINANCIAL AID INFORMATION ABOUT RELATED PRODUCTS AND SERVICES TO STUDENTS IN THE HEALTH CARE FIELD AND TO FINANCIAL AID ADMINISTRATORS AND OTHER PROFESSIONALS IN THE HEALTH CARE EDUCATION COMMUNITY, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 4–23–1998; IN COMMERCE 4–23–1998.

OWNER OF U.S. REG. NOS. 1,436,693 AND 1,532,986.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "HEALTH", APART FROM THE MARK AS SHOWN.

SN 74–626,291, FILED 1–27–1995.

STANLEY I. OSBORNE, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

Reg. No. 2,107,587

## United States Patent and Trademark Office

Registered Oct. 21, 1997

### SERVICE MARK
### PRINCIPAL REGISTER

## MEDICAL ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN PROGRAMS AND SERVICES FOR
GRADUATE MEDICAL STUDENTS; PROVI-
SION OF FINANCIAL AID INFORMATION
ABOUT RELATED PRODUCTS AND SERV-
ICES TO GRADUATE MEDICAL STUDENTS
AND TO FINANCIAL AID ADMINISTRATORS
AND OTHER PROFESSIONALS IN THE

GRADUATE MEDICAL EDUCATION COMMU-
NITY, IN CLASS 36 (U.S. CLS. 100, 101 AND
102).
FIRST USE 3–18–1995; IN COMMERCE
3–18–1995.
OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "MEDICAL", APART FROM
THE MARK AS SHOWN.

SN 74–626,292, FILED 1–27–1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

Reg. No. 2,036,061

## United States Patent and Trademark Office

Registered Feb. 4, 1997

### SERVICE MARK
### PRINCIPAL REGISTER

## DENTAL ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN PROGRAMS AND SERVICES FOR
GRADUATE DENTAL STUDENTS; PROVI-
SION OF FINANCIAL AID INFORMATION
ABOUT RELATED PRODUCTS AND SERV-
ICES TO GRADUATE DENTAL STUDENTS
AND TO FINANCIAL AID ADMINISTRATORS
AND OTHER PROFESSIONALS IN THE
GRADUATE DENTAL EDUCATION COMMU-
NITY, IN CLASS 36 (U.S. CLS. 100, 101 AND
102).

FIRST USE 3–18–1995; IN COMMERCE
3–18–1995.

OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "DENTAL", APART FROM
THE MARK AS SHOWN.

SN 74–626,293, FILED 1–27–1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

Reg. No. 2,036,062

## United States Patent and Trademark Office

Registered Feb. 4, 1997

### SERVICE MARK
### PRINCIPAL REGISTER

## GRADUATE ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN PROGRAMS AND SERVICES FOR
GRADUATE STUDENTS; PROVISION OF FI-
NANCIAL AID INFORMATION ABOUT RE-
LATED PRODUCTS AND SERVICES TO
GRADUATE STUDENTS AND TO FINANCIAL
AID ADMINISTRATORS AND OTHER PRO-
FESSIONALS IN THE GRADUATE EDUCA-

TION COMMUNITY, IN CLASS 36 (U.S. CLS.
100, 101 AND 102).

FIRST USE 3-18-1995; IN COMMERCE
3-18-1995.

OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "GRADUATE", APART FROM
THE MARK AS SHOWN.

SN 74-626,569, FILED 1-27-1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

## United States Patent and Trademark Office

Reg. No. 1,994,686

Registered Aug. 20, 1996

### SERVICE MARK
### PRINCIPAL REGISTER

## BUSINESS ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN PROGRAMS AND SERVICES FOR
BUSINESS STUDENTS; PROVISION OF FINAN-
CIAL AID INFORMATION ABOUT RELATED
PRODUCTS AND SERVICES TO BUSINESS
STUDENTS AND TO FINANCIAL AID ADMIN-
ISTRATORS AND OTHER PROFESSIONALS IN

THE BUSINESS EDUCATION COMMUNITY, IN
CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 6-30-1994; IN COMMERCE
7-17-1994.

OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "BUSINESS", APART FROM
THE MARK AS SHOWN.

SER. NO. 74-630,141, FILED 2-6-1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

Reg. No. 1,994,686

## United States Patent and Trademark Office

Registered Aug. 20, 1996

## SERVICE MARK
### PRINCIPAL REGISTER

## BUSINESS ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN PROGRAMS AND SERVICES FOR
BUSINESS STUDENTS; PROVISION OF FINAN-
CIAL AID INFORMATION ABOUT RELATED
PRODUCTS AND SERVICES TO BUSINESS
STUDENTS AND TO FINANCIAL AID ADMIN-
ISTRATORS AND OTHER PROFESSIONALS IN

THE BUSINESS EDUCATION COMMUNITY, IN
CLASS 36 (U.S. CLS. 100, 101 AND 102).
FIRST USE 6-30-1994; IN COMMERCE
7-17-1994.
OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "BUSINESS", APART FROM
THE MARK AS SHOWN.

SER. NO. 74-630,141, FILED 2-6-1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

## United States Patent and Trademark Office

Reg. No. 1,953,050
Registered Jan. 30, 1996

## SERVICE MARK
### PRINCIPAL REGISTER

## NEED ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF FINANCIAL
NEED ANALYSIS PROGRAMS AND RELAT-
ED SERVICES FOR STUDENTS; PROVISION
OF FINANCIAL NEED ANALYSIS INFORMA-
TION AND RELATED PRODUCTS AND SERV-
ICES TO STUDENTS AND TO FINANCIAL
AID ADMINISTRATORS AND OTHER PRO-

FESSIONALS IN THE EDUCATION COMMUNI-
TY, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).
FIRST USE 12–13–1994; IN COMMERCE
12–13–1994.
OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "NEED", APART FROM THE
MARK AS SHOWN.

SER. NO. 74–630,190, FILED 2–6–1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

## United States Patent and Trademark Office

Reg. No. 1,956,095
Registered Feb. 13, 1996

## SERVICE MARK
## PRINCIPAL REGISTER

# LAW ACCESS

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN PROGRAMS AND SERVICES FOR
LAW STUDENTS; PROVISION OF FINANCIAL
AID INFORMATION ABOUT RELATED PROD-
UCTS AND SERVICES TO LAW STUDENTS
AND TO FINANCIAL AID ADMINISTRATORS
AND OTHER PROFESSIONALS IN THE

LEGAL EDUCATION COMMUNITY, IN CLASS
36 (U.S. CLS. 100, 101 AND 102).
FIRST USE 7–14–1986; IN COMMERCE
7–14–1986.
OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "LAW", APART FROM THE
MARK AS SHOWN.

SER. NO. 74–630,253, FILED 2–6–1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

**United States Patent and Trademark Office**
Reg. No. 1,956,097
Registered Feb. 13, 1996

## TRADEMARK
## PRINCIPAL REGISTER

## NEED ACCESS

LAW ACCESS, INC. (DELAWARE CORPORATION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: COMPUTER SOFTWARE USED TO ANALYZE THE FINANCIAL NEED OF STUDENTS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 12-13-1994; IN COMMERCE 12-13-1994.

OWNER OF U.S. REG. NOS. 1,436,693 AND 1,532,986.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "NEED", APART FROM THE MARK AS SHOWN.

SER. NO. 74-630,647, FILED 2-6-1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

## United States Patent and Trademark Office

Reg. No. 2,093,437

Registered Sep. 2, 1997

## TRADEMARK
### PRINCIPAL REGISTER

## THE ACCESS GROUP

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: COMPUTER SOFTWARE USED TO
ANALYZE THE FINANCIAL NEED OF STU-
DENTS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36
AND 38).

FIRST USE 4–0–1996; IN COMMERCE
4–0–1996.
OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "GROUP", APART FROM THE
MARK AS SHOWN.

SN 74–633,795, FILED 2–13–1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

Reg. No. 2,036,077

## United States Patent and Trademark Office

Registered Feb. 4, 1997

### SERVICE MARK
### PRINCIPAL REGISTER

## THE ACCESS GROUP

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATION-
AL LOAN AND FINANCIAL NEED ANALYSIS
PROGRAMS AND RELATED SERVICES FOR
STUDENTS; PROVISION OF FINANCIAL
NEED ANALYSIS INFORMATION AND FI-
NANCIAL AID INFORMATION ABOUT RE-
LATED PRODUCTS AND SERVICES TO STU-
DENTS AND TO FINANCIAL AID ADMINIS-
TRATORS AND OTHER PROFESSIONALS IN
THE EDUCATION COMMUNITY, IN CLASS 36
(U.S. CLS. 100, 101 AND 102).

FIRST USE 3–18–1995; IN COMMERCE
3–18–1995.

OWNER OF U.S. REG. NOS. 1,436,693 AND
1,532,986.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "GROUP", APART FROM THE
MARK AS SHOWN.

SN 74–633,796, FILED 2–13–1995.

JEFFREY R. COHEN, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

Reg. No. 2,084,912

## United States Patent and Trademark Office

Registered July 29, 1997

## TRADEMARK
### PRINCIPAL REGISTER

## ACCESS ADVISOR

LAW ACCESS, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: DEBT MANAGEMENT COMPUTER
SOFTWARE USED IN CONNECTION WITH
STUDENT FINANCIAL AID SERVICES, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 4-0-1996; IN COMMERCE
4-0-1996.

OWNER OF U.S. REG. NOS. 1,436,693 AND
1,953,050.

SN 75-055,050, FILED 2-8-1996.

RICHARD KIM, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

Reg. No. 2,395,179

## United States Patent and Trademark Office

Registered Oct. 17, 2000

## TRADEMARK
## PRINCIPAL REGISTER

## ACCESS ADVISOR ADMINISTRATOR

ACCESS GROUP, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: DEBT MANAGEMENT COMPUTER SOFT-
WARE USE IN CONNECTION WITH STUDENT FI-
NANCIAL AID SERVICES, IN CLASS 9 (U.S. CLS.
21, 23, 26, 36 AND 38).

FIRST USE 11–30–1998; IN COMMERCE
11–30–1998.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT
TO USE "ADMINISTRATOR", APART FROM THE
MARK AS SHOWN.

SER. NO. 75–691,551, FILED 4–26–1999.

MELVIN AXILBUND, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

Reg. No. 2,395,180

## United States Patent and Trademark Office

Registered Oct. 17, 2000

### SERVICE MARK
### PRINCIPAL REGISTER

## ACCESS GROUP

ACCESS GROUP, INC. (DELAWARE CORPORA-
TION)
FOULKSTONE PLAZA
1411 FOULK ROAD
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATIONAL
LOAN AND FINANCIAL NEED ANALYSIS PRO-
GRAMS AND RELATED SERVICES FOR STUDENTS;
PROVISION OF FINANCIAL NEED ANALYSIS IN-
FORMATION AND FINANCIAL AID INFORMATION
ABOUT RELATED PRODUCTS AND SERVICES TO
STUDENTS AND TO FINANCIAL AID ADMINIS-

TRATORS AND OTHER PROFESSIONALS IN THE
EDUCATION COMMUNITY, IN CLASS 36 (U.S. CLS.
100, 101 AND 102).

FIRST USE 12–31–1997; IN COMMERCE 1–2–1998.
OWNER OF U.S. REG. NOS. 2,036,077, 2,093,437
AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT
TO USE "GROUP", APART FROM THE MARK AS
SHOWN.

SER. NO. 75–691,557, FILED 4–26–1999.

MELVIN AXILBUND, EXAMINING ATTORNEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 2,680,790

Registered Jan. 28, 2003

## SERVICE MARK
### PRINCIPAL REGISTER

## SPONSORED ACCESS

ACCESS GROUP, INC. (DELAWARE CORPORA-
TION)
1411 FOULK ROAD
P.O. BOX 7430
WILMINGTON, DE 19803

FOR: ADMINISTRATION OF EDUCATIONAL
LOAN PROGRAMS AND SERVICES FOR THE
BENEFIT OF STUDENTS, AND SPECIFICALLY
LOAN PROGRAMS AND SERVICES DIRECTED
TOWARD THIRD PARTIES WHO WILL FINANCE
A STUDENT'S EDUCATION; PROVISION OF FI-
NANCIAL AID INFORMATION ABOUT RELATED
PRODUCTS AND SERVICES TO STUDENTS AND
TO FINANCIAL AID ADMINISTRATORS AND

OTHER PROFESSIONALS IN THE HIGHER EDU-
CATION COMMUNITY, IN CLASS 36 (U.S. CLS. 100,
101 AND 102).

FIRST USE 2-19-2002; IN COMMERCE 2-19-2002.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "SPONSORED", APART FROM
THE MARK AS SHOWN.

SER. NO. 76-396,376, FILED 4-18-2002.

SUSAN STIGLITZ, EXAMINING ATTORNEY

# EXHIBIT C



**access group**

*The nonprofit graduate loan specialist*

5500 Brandywine Parkway
P.O. Box 7430
Wilmington, DE 19803-0430

General Number: 302-477-4000
School Services: 800-227-3151
Customer Contact Center: 800-282-1550

Fax: 302-477-4080
accessgroup.org

**Daniel R. Lau**
*President & Chief Executive Officer*

August 17, 2005

Ref. Dan Lau
Dep. DAN LAU

Date  08/17/2005
Wgt: 0 1 L
DV                0.00

SHIPPING
SPECIAL:
HANDLING
TOTAL.

8.01
1.00
0.00
0.01

Svcs: STANDARD OVERNIGHT
TRCK: 6081 8885 8810

Mr. Willis J. Hulings, III
President & CEO
The Education Resources Institute, Inc.
4th Floor
31 Saint James Street
Boston, MA  02116

Re:    Unauthorized Use of ACCESS Service Mark

Dear Mr. Hulings:

As you may know, Access Group, Inc. and TERI have a well-established history of cooperation in the field of providing education loans, and therefore you can understand our surprise and dismay upon learning that TERI has made use of the service mark TERI COLLEGE ACCESS. Access Group, Inc. has for many years used a family of service marks centering on the use of the term ACCESS. In recognition of our many years of use of these marks, the U.S. Patent and Trademark Office has issued us 14 separate service mark registrations for ACCESS marks such as ACCESS GROUP, SPONSORED ACCESS, COMPREHENSIVE ACCESS, MEDICAL ACCESS, GRADUATE ACCESS and LAW ACCESS.

Clearly TERI is aware of these well-established rights in the ACCESS mark in view of our prior business arrangements. For example, TERI was a party to a Coordination Agreement with Access Group dated March 23, 1995. In this agreement, TERI specifically agreed that it would not make use of the term "ACCESS" as a service mark in connection with providing educational financial aid services. However, the website www.tericollegeaccess.org clearly contradicts these existing contractual obligations.

In light of our prior business dealings, we are inclined to give TERI the benefit of the doubt and assume that this infringement upon our proprietary rights and breach of the 1995 agreement were unintentional. Nonetheless, we will expect that TERI will promptly cease all use of the ACCESS mark, including changing both the tericollegeaccess.org website and the domain name. Access Group, Inc. takes this matter very seriously and therefore must insist that TERI immediately take action to stop use of the ACCESS mark. It is our sincere hope that this matter can quickly be resolved amicably without incurring a significant cost or disruption to either of our day-to-day business activities.

Sincerely,

*Daniel R. Lau*

Daniel R. Lau

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ACCESS GROUP, INC.

## DEFENDANTS

THE EDUCATION RESOURCES INSTITUTE, INC.

(b) County Of Residence Of First Listed Plaintiff:
(Except In U.S. Plaintiff Cases)

County Of Residence Of First Listed Defendant:
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(c) Attorneys (Firm Name, Address, And Telephone Number)
Elena C. Norman, Esquire (#4780)
Sara Beth A. Reyburn, Esquire (#4137)
Young Conaway Stargatt & Taylor, LLP
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Attorneys (If Known)

## II. BASIS OF JURISDICTION
(PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place An X In One Box For Plaintiff And
(For Diversity Cases Only)    One Box For Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## V. NATURE OF SUIT
(Place An X In One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted (Excl. Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholders' Suits ☐ 190 Other Contract ☐ 195 Contract Product Liability | **PERSONAL INJURY** ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury | **PERSONAL INJURY** ☐ 362 Personal Injury - Med Malpractice ☐ 365 Personal Injury - Product Liability ☐ 368 Asbestos Personal Injury Product Liability **PERSONAL ROPERTY** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | ☐ 610 Agriculture ☐ 620 Other Food & Drug ☐ 625 Drug Related Seizure of Property 21 U.S.C. 881 ☐ 630 Liquor Laws ☐ 640 R.R. & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other **LABOR** ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Railway Labor Act ☐ 790 Other Labor Litigation ☐ 791 Empl Ret Inc Security Act | ☐ 422 Appeal 28 U.S.C. 158 ☐ 423 Withdrawal 28 U.S.C. 157 **PROPERTY RIGHTS** ☐ 820 Copyrights ☐ 830 Patent ☒ 840 Trademark **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) **FEDERAL TAX SUITS** ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS - Third Party 26 U.S.C. 7609 | ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce/ICC Rates, etc. ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 U.S.C. 3410 ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 895 Freedom of Information Act ☐ 900 Appeal of Fee Determination Under Equal Access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions |

| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS |
|---|---|---|
| ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | ☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence Habeas Corpus ☐ 530 General ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition |

## IV. ORIGIN
(PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding    ☐ 2 Removed from Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. §§ 1051 et seq.

Brief description of cause:
Trademark Infringement and Unfair Competition

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

CLASS ACTION ☐ YES ☐ NO

DEMAND $

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions)

JUDGE:

DOCKET NUMBERS:

DATE

SIGNATURE OF ATTORNEY OF RECORD

2/23/07

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**   **(a)**   **Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

**(c)**   **Attorneys.** Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**V.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**VI.**   **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 7 - 1 1 6 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 2 _____ COPIES OF AO FORM 85.

FEB 2 3 2007
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action